ORAL ARGUMENT IS REQUESTED

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

_____

No. 11-2198

UNITED STATES OF AMERICA,
Plaintiff/Appellee,

vs.

BRAD AHRENSFIELD
Defendant/Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
Honorable James A. Parker, United States District Judge

# DEFENDANT/APPELLANT'S BRIEF IN CHIEF

Jason Bowles
B.J. Crow
Monnica L. Garcia
Bowles and Crow
P.O. Box 25186
Albuquerque, N.M. 87125
Telephone: (505) 217-2680
Facsimile: (505) 217-2681
Email:
Jason@bowlesandcrow.com
bj@bowlesandcrow.com
Monnica@bowlesandcrow.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii, iv, v

STATEMENT OF PRIOR RELATED APPEALS . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Facts Pertinent to Rule 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Facts Pertinent to Brady Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    The Brady/Giglio Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    The Rule 29 Motion for Judgment of Acquittal . . . . . . . . . . . . . . . . . . . 21

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    I.    THE DISTRICT COURT ERRED IN FINDING THAT THE
          EXCULPATORY EVIDENCE OF THE GOVERNMENT
          SUPPRESSED WAS NOT MATERIAL . . . . . . . . . . . . . . . . . . . . . 22

          Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

          Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

          The Government Suppressed the Transcripts and Recordings
          of an Interview and Telephone Call with Key Witness,
          Information Concerning Exculpatory Text Messages, as well
          as Lab Report that Constituted Impeachment Material . . . . . . . . . . 28

          The Suppressed Evidence was Material and Exculpatory . . . . . . . . . 34

II.    THE DISTRICT COURT ERRED BY ALLOWING THE
GOVERNMENT TO INTRODUCE EVIDENCE OF MR.
AHRENSFIELD MAKING ALLEGED FALSE STATEMENTS
TO THE FBI BECAUSE THE JURY ACQUITTED SUCH
CONDUCT IN THE FIRST TRIAL . . . . . . . . . . . . . . . . . . . . . . . . 38

    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    The Double Jeopardy Clause Bars Re-Litigation of the False
    Statements Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

III.   THE DISTRICT COURT ERRED IN DENYING MR.
AHRENSFIELD'S MOTION FOR JUDGMENT OF
ACQUITTAL UNDER FED. R. CRIM. P. 29 . . . . . . . . . . . . . . . . 44

        Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

        Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

        The Evidence is Insufficient to Support Each Element
        The Court Should Have Not Considered Hearsay
        Statements & So-Called Impeachment Evidence as
        Substantive Evidence When Deciding the Rule 29 Motion . . 49

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

STATEMENT ON ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . 59

STATEMENT OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

CERTIFICATE OF DIGITAL SUBMISSION . . . . . . . . . . . . . . . . . . . . . 60

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

ADDENDUM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

# TABLE OF AUTHORITIES

## United States Supreme Court Cases

Arthur Anderson, LLP v. United States, 544 U.S. 696, (2005) . . . . . . . . . 24, 45, 57

Brady v. Maryland, 373 U. S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) . . 26, 59

Napue v. Illinois, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Smith v. Cain, 132 S. Ct. 627 (U.S. 2012) . . . . . . . . . . . . . . . . . . . . 25, 26, 27, 59

## 10th Circuit Court of Appeals Cases

Douglas v. Workman, 560 F.3d 1156, (10th Cir. Okla. 2009) . . . . . . . . . . . . . . 24

Fero v. Kerby, 39 F.3d 1462, (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Trammell v. McKune, 485 F.3d 546(10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . 36

United States v. Aguilar, 515 U.S. 593 (1995) . . . . . . . . . . . . . . . 45, 46, 50, 51, 52

United States v. Anderson, 778 F.2d 602 (10th Cir. 1985) . . . . . . . . . . . . . . . . . 24

United States v. Burke, 571 F.3d 1048 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . 23

United States v. Colonna, 360 F.3d 1169 (10th Cir. 2004) . . . . . . . . . . . . . . . . . 44

United States v. Crook, 213 Fed. Appx. 754 (10th Cir. Okla. 2007) . . . . . . . . . . 44

United States v. Davis, 578 F.2d 277 (10th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . 24

United States v. Erickson, 561 F.3d 1150 (10th Cir. 2009) . . . . . . . . . . . . . . . . . 54

United States v. Flanders, 491 F.3d 1197 (10th Cir. 2007) . . . . . . . . . . . . . . . . . 44

United States v. Ford, 550 F.3d 975 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . 22

United States. v. Gonzalez-Montoya, 161 F.3d 643 (10th Cir. 1998) . . . . . . . . . 24

United States v. Howell, 285 F.3d 1263 (10th Cir. N.M. 2002) . . . . . . . . . . . . . 37

United States v. Phillips, 583 F.3d 1261 (10th Cir. 2009) . . . . . . . . . . . 45, 47, 55

United States v. Oberle, 136 F.3d 1414 (10th Cir. N.M. 1998) . . . . . . . . . . . . . 37

United States v. Ramirez, 63 F.3d 937 (10th Cir. N.M. 1995) . . . . . . . . . . . . . . 37

United States v. Tager, 481 F.2d 97 (10th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . 44

States v. Torres, 569 F.3d 1277 (10th Cir. N.M. 2009) . . . . . . . . . . . . . . . . . . . 37

United States v. Walters, 269 F.3d 1209 (10th Cir. 2001) . . . . . . . . . . . . . . . . . 23

United States v. Wittig, 575 F.3d 1085 (10th Cir. 2009) . . . . . . . . . . . . . . . . 39, 40

## Other Circuit Cases

United States v. Quattrone, 441 F.3d 153 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . 49

United States v. Seley, 957 F.2d 717 (9th Cir. Ariz. 1992) . . . . . . . . . . . . . . . . 44

## Federal District Court Cases

United States v. Hicks, 2010 U.S. Dist. LEXIS 41865
(W.D. Va. Apr. 28, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

United States v. Rey, 2010 U.S. Dist. LEXIS 24021 (D.N.M. Mar. 2, 2010) . . .  43

Yeager v. United States, 129 S. Ct. 2360(U.S. 2009) . . . . . . . . . . . . . . . 39, 40, 41

## Statutes

18 U.S.C. § 1001(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

18 U.S.C. § 1512(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 41, 45, 48, 49, 51

18 U.S.C. § 1515(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## Congressional Records

S. Rep. 532, 97th Congress, 2d Sess. 15, reprinted in 1982 U.S.
Code Cong. & Admin. News, 2515, 2521 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

**Rules**

Fed. R. Crim. 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## STATEMENT OF PRIOR RELATED APPEALS

There was a prior appeal in Ahrensfield v. United States, No. 10-2251, which has been dismissed without prejudice by agreement. There are no related appeals.

## STATEMENT OF THE ISSUES

1. Did the District Court err in denying Mr. Ahrensfield's Motion to Dismiss for the government's suppression of material, favorable evidence?

2. Did the District Court err by allowing the government, in the second trial, to introduce evidence of Mr. Ahrensfield making alleged false statements to FBI Agents, when a jury already acquitted Mr. Ahrensfield of such conduct?

3. Did the District Court err when it denied Mr. Ahrensfield's Motion for Judgment of Acquittal under Fed. R. Crim. P. 29?

## JURISDICTION

Brad Ahrensfield appeals from three separate Orders entered in the United States District Court for the District of New Mexico on November 22, 2010, June 8, 2011 and July 5, 2011. The District Court entered its Judgment on September 27, 2011 (Doc. 197). Mr. Ahrensfield timely appealed on October 7, 2011 (Doc. 200). The District Court's subject matter jurisdiction was based on 18 U.S.C. § 1512(c)(2). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE CASE

On December 3, 2009, a grand jury issued a two-count indictment charging Mr. Ahrensfield in Count I with obstruction, 18 U.S.C. § 1512(c)(2) and in Count II with making false statements to FBI Agents, 18 U.S.C. § 1001(a)(2). *Doc. 2, Appendix at 1.* After a trial, the jury found Mr. Ahrensfield not guilty of making false statements and could not reach a verdict on obstruction of justice. *Doc. 57, Appendix at 4.* The District Court denied a motion for directed verdict on the obstruction charge, but noted, "this case presents somewhat of a close call". *Doc. 78* at 11, Appendix at 24.

The government sought retrial on the obstruction of justice count. Mr. Ahrensfield filed a motion to exclude evidence of the acquitted conduct [i.e. making false statements to FBI], for purposes of showing "consciousness of guilt" because the prior jury found him not guilty of lying to the FBI and the Double Jeopardy Clause prevented him from being retried on such. *Doc. 85,* Appendix at 43. The Court denied that motion and the government argued to the second jury that Ahrensfield lied to the FBI.

On December 14, 2010, during retrial, the government questioned its witness, Shawn Bryan, and read from a transcript of an interview the FBI had conducted with Bryan on April 27, 2010, after the conclusion of Ahrensfield's first trial. The defense asked to see the interview and informed the Court that the

Government had never provided defense counsel with a transcript or recording of the interview. *Doc. 151* at 216.  On December 15, 2010, Ahrensfield filed a Motion to Dismiss due to the government's nondisclosure of the interview. *Doc. 121,* Appendix at 139.  The District Court held an evidentiary hearing, took the motion under advisement and continued with the trial.

The jury began deliberating on December 15, 2010 and continued its deliberations on December 16, 2010.  After approximately seven hours of deliberation, the jury indicated that it had voted twice but was unable to reach a verdict. *Doc. 136,* Appendix at 169.  It was only after the Court gave a modified *Allen* charge that the jury ultimately returned a guilty verdict. *Doc. 140,* Appendix at170.

After the trial Ahrensfield filed a Rule 29 Motion for Judgment of Acquittal and the Court denied it, but again found that "the evidence in this case presents somewhat of a close call" and that "Bryan's testimony at the second trial was much more equivocal with respect to the exact information that Ahrensfield provided to Bryan and that Bryan did not identify Ahrensfield as the individual who provided Bryan with the majority of the details about the undercover operation." *Doc. 171* at 11, 13, Appendix at 451, 453.

The Court took additional testimony of the *Brady* motion after trial. Meanwhile, the defense learned of additional *Brady* and *Giglio* violations

committed by the government and filed numerous supplemental briefs and

exhibits.  The Court ordered Ahrensfield to file a consolidated motion that

addressed the *Brady* violation, and that if the Court concluded that a *Brady*

violation occurred and that the prosecutor did not act in good faith, that the Court

would order additional briefing regarding the pattern and practice of misconduct.

*Doc. 161,*Appendix 279.

Pursuant to the Court's Order, Ahrensfield filed his Consolidated Motion to

Dismiss for *Brady/ Giglio* Violations. *Doc. 163* Appendix at 302.  He  argued that

the government failed to provide the transcripts of an interview agents had with a

key government witness (or even disclose that an interview took place), failed to

provide the recordings of the interview, and failed to provide a laboratory report.

The district court denied Ahrensfield's motion to dismiss but found that the

prosecutor suppressed the evidence and that the transcripts of the interview were

favorable to Ahrensfield. *Doc. 170,* Appendix at 405.  The Court held, "the

transcripts contained a number of statements that implicated individuals other than

Ahrensfield as having been the source of the specific details of the investigation",

but that the transcripts were not material, even though "the materiality of the

suppressed evidence [was] a close and difficult issue". *Id*. at 13, Appendix at 417.

Departing downward from the guideline range, the District Court sentenced

Ahrensfield to 6 months and one day incarceration, followed by 6 months of home

confinement and a term of supervised release. *Doc. 197,* Appendix at 465. This appeal followed.

## STATEMENT OF FACTS

Except where indicated, the below facts are taken from the District Court's Memorandum Opinion and Orders on Defendant's Motions that are the subject of this appeal. *Doc. 93,* Appendix 58, *170,* Appendix at405, *and 171,* Appendix at 441

### a. Facts Pertinent to Rule 29

In September 2009, the Albuquerque Police Department ("APD") received a tip from a confidential informant CI ("CI") that a criminal enterprise was operating out of Car Shop, a business in Albuquerque, New Mexico. The CI reported that Gilbert Montoya, a mechanic at Car Shop, was selling narcotics.  The CI also alleged that three employees of Car Shop, including Shawn Bryan, the owner, had purchased stolen property from the CI in the past.  The CI contended that Bryan "ran the show" and that nothing took place at Car Shop without Bryan's permission.  Trial 2 Tr. at 33.  As a result of this information, a task force that included members of APD and the Federal Bureau of Investigation ("FBI") began an undercover investigation of Car Shop and Bryan. As part of this investigation, the task force used the CI to make a number of controlled drug purchases from Gilbert Montoya.  The task force intended to arrest Montoya after making a series

of drug purchases and then attempt to "roll" Montoya to get information about Bryan's alleged criminal activity.  During the first controlled purchase, the CI and Montoya met at a location away from Car Shop and the CI purchased a quarter-pound of marijuana from Montoya.  During the second controlled purchase, the CI met Montoya at Car Shop and again purchased a quarter-pound of marijuana. Trial 2 Tr. at 39.  During the third controlled purchase, the CI and Montoya met about a block away from Car Shop and the CI purchased twenty bundles of  alleged crack cocaine.  Trial 2 Tr. at 43. The task force planned to make a fourth and final controlled purchase that never occurred due to the events that led to Ahrensfield's arrest and prosecution.

In addition to making the controlled drug purchases, the task force also set up surveillance to investigate the allegations that stolen property was being sold and stored at Car Shop. During the surveillance of Car Shop, the officers noticed that Zach Ahrensfield, Brad Ahrensfield's high school age son, was working at the business.  Because Brad Ahrensfield was an APD officer, one of the investigating officers, Ron Olivas, thought that Ahrensfield should be informed about the investigation.  Despite being instructed not to inform Ahrensfield, Olivas told Ahrensfield about the investigation and helped Ahrensfield devise a story to tell Bryan that would allow Ahrensfield to get his son to stop working without alerting Bryan to the investigation.

On September 22, 2010, Ahrensfield called Bryan to advise him that Zach Ahrensfield could no longer work at Car Shop. Ahrensfield told Bryan that his son could not work there anymore because he needed to focus on his school responsibilities. Later that night, Ahrensfield called Bryan a second time, from a payphone. Ahrensfield asked Bryan to meet on the street outside of Bryan's gated community and told him to wear a ball cap. Ahrensfield drove his girlfriend's Jeep. When Bryan got into the Jeep, Ahrensfield proceeded to talk generally to Bryan about the investigation. Ahrensfield informed Bryan that APD and the FBI were conducting an undercover operation at Car Shop, that Bryan was suspected of being the "sergeant major," or leader, of a crime organization, and that Bryan's mechanic was dealing drugs. Later that night, Bryan contacted Darren White, who was then the Bernalillo County Sheriff, to inquire about why he was under investigation.   The next morning, September 23, 2009, Bryan met with Joe Hudson, who was at that time the Commander of APD, and asked Hudson about the undercover investigation. It became apparent to Hudson from his conversation with Bryan that Bryan was aware of details of the investigation, and Bryan informed Hudson that he had learned about the investigation from Ahrensfield. Later that morning, Hudson and Bryan met with Robert Smith, who was at that time a Lieutenant with APD, and Bryan again disclosed details about the investigation.  Subsequently, the investigation was "shut down"; however, the task

7

force still arrested and interrogated Gilbert Montoya. The CI did not make any further drug buys. Gilbert Montoya did not provide any information that implicated Bryan in any criminal activity.

### b. Facts Pertinent to *Brady* Motion

On December 15, 2010, in the midst of a retrial, the defense filed a Motion to Dismiss With Prejudice Based on Brady Violation (Motion to Dismiss) (Doc. No. 121, Appendix at 139). The Court took the Motion to Dismiss under advisement and continued the trial. On December 16, 2010, the jury returned a guilty verdict. On March 11, 2011 Ahrensfield filed a Consolidated Motion to Dismiss for Brady/Giglio Violations (*Brady* Motion) (Doc. No. 163, Appendix at 302). The Government filed its Response (Doc. No. 166, Appendix at 349) on March 23, 2011 and Ahrensfield filed his Reply (Doc. No. 168, Appendix at 394) on April 6, 2011. The Court denied the motion.

During the direct examination of Shawn Bryan at the second trial, the Government read from a transcript of an interview that the FBI had conducted with Bryan after Ahrensfield's first trial. Ahrensfield's counsel told the Court that Ahrensfield had never been provided with a copy of the transcript or a recording of the interview and that Ahrensfield and his counsel were unaware that the FBI had interviewed Bryan following the first trial. Trial 2 Tr. at 216. At that point, the Government provided Ahrensfield's counsel with a copy of the transcript of

Bryan's interview.  Ahrensfield's counsel read through the transcript over the lunch hour, but later informed the Court that there was a significant amount of *Brady* material and requested additional time to highlight relevant portions of the transcript that could be used during cross-examination. Ahrensfield's counsel also made an oral motion to dismiss the case due to the Government's *Brady* violation. The Court allowed counsel to take a break to review the transcript, and the trial continued later that afternoon.

The next morning, Ahrensfield filed his Motion to Dismiss, asserting that the transcript contained *Brady* material, that the Government had improperly withheld it, and that the indictment against Ahrensfield should be dismissed due to the Government's misconduct.  Prior to the resumption of trial testimony that morning, the Court held an evidentiary hearing on whether the Government had provided the transcript to Ahrensfield before the second trial.  During the hearing, Ahrensfield discovered that the Government had also failed to provide a transcript of a phone call that Bryan had made to the FBI prior to the interview. Because the Court needed to hear testimony on the Motion to Dismiss from additional witnesses, the Court continued the evidentiary hearing, deferred ruling on Ahrensfield's Motion to Dismiss, and resumed trial.  The following day, December 16, 2010, the jury returned a guilty verdict.

Ahrensfield argued that in addition to failing to provide him with a copy of the interview and phone call transcripts, the Government also failed to provide him with a copy of the audio recordings of the interview and phone call until after the trial had concluded. Moreover, Ahrensfield pointed out that the Government failed to provide a laboratory report indicating that the substance Gilbert Montoya sold to the CI tested positive for cocaine.  Thus, Ahrensfield identified three separate *Brady* violations—the failure to provide the transcripts until the middle of the trial, the failure to provide the recordings until after the trial, and the complete failure to provide the laboratory report.

The first alleged *Brady* violation involved the transcripts of the FBI's interview with Bryan (Interview Transcript) and the phone call that Bryan made to the FBI (Phone Call Transcript).  The Court concluded that the transcripts were both suppressed and favorable, but that Ahrensfield failed to meet his burden of showing that the transcripts were material and that the Government therefore commited a *Brady* violation. *See Doc. 170* at 9-13,Appendix at 413-417, *Memorandum Opinion and Order*, (discussing testimony of three employees from Bowles & Crow and employees of the U.S. Attorney's Office).

On two occasions, November 18 and December 1, employees of Bowles & Crow went to the reception area at the U.S. Attorney's office and asked if there were any packages for the firm.  On both occasions, the employees were told that

there was nothing despite the fact that there were actually two envelopes in the box that should have been provided—the discovery in the unrelated case and the transcripts at issue. Because the Government had exclusive control over the outgoing box where the transcripts were eventually located, and because the Government failed to provide the transcripts to Ahrensfield's counsel despite repeated attempts to obtain the transcripts, the Court concluded that the Government suppressed the transcripts.

The District Court found that the prosecutor failed to provide Ahrensfield with the transcripts prior to trial, but that the failure was not intentional and was the result of negligence or mistake. The Court therefore concluded that the prosecutor did not act in bad faith, but the evidence was still suppressed.

With respect to the second element, favorability, the Government did not dispute that the evidence contained in the transcripts was favorable to Ahrensfield. And, given that the transcripts contained a number of statements that implicated individuals other than Ahrensfield as having been the source of the specific details of the investigation, the Court found that the transcripts contained potentially exculpatory information and were therefore favorable to the defense.

On the third element, the Court considered the materiality of the suppressed evidence to be "a close and difficult issue". Because the transcripts were provided to Ahrensfield during trial, the Court had to first determine, when addressing

11

whether the suppressed evidence was material, whether the outcome of the trial would have been different had Ahrensfield been provided with the information earlier.

In his interview with the FBI, Bryan made a number of statements that Ahrensfield contended were material. Bryan was interviewed by two FBI Agents: Drew McCandless and Marcus Washington. During the interview, Bryan asserted that Ahrensfield only told Bryan a rumor about the investigation and that Bryan actually learned the details of the investigation from two sources: Darren White and Joe Hudson. Bryan told the FBI agents that Darren White was providing information by having his wife, Kathy White, send text messages to Byran's wife, Erika Bryan. Interview Transcript at 54. Bryan also asserted that when he met with Joe Hudson on the morning of September 23, 2010, Hudson provided Bryan with a number of additional details. *Id.* at 24, 31.

The Court noted that Ahrensfield identified four different ways in which he would have used the evidence in the transcripts had he received the transcripts prior to trial. First, Ahrensfield asserted that he could have used the transcripts of the interview and phone call to prepare extensive cross-examination of Bryan, and Agents McCandless, and Washington. Second, Ahrensfield stated that he could have obtained a subpoena for Erika Bryan's phone and could have had a computer expert attempt to retrieve the text messages that Ms. Bryan allegedly received from

Darren White's wife. Along these same lines, Ahrensfield asserted that he would have subpoenaed Erika Bryan and Kathy White to testify at trial about the contents of the text messages that were sent on the night of September 22, 2009. Third, Ahrensfield maintained that he would have used the information in the transcript to cross examine Joe Hudson.  Finally, Ahrensfield declared that he would have used the transcripts to cross-examine Darren White regarding whether White provided information to Bryan.  The defense argued that because the two transcripts, the recordings and the lab report were not provided, the defense team could not have possibly incorporated those into its trial preparation or strategy. There was barely time to highlight the transcript and identify its exculpatory nature, during trial.

With respect to the text messages, the Court noted that the transcript only contained information about the existence of *other* evidence that was not in the possession of the Government—the testimony of Erika Bryan, the testimony of Kathy White, and the potential that text messages might be retrievable from Erika Bryan's cell phone.

In Bryan's interview with the FBI, he stated that Kathy White was sending text messages to Erika Bryan in "September, October, and November" and that "Kathy is the one that exposed" information to Bryan. Interview Transcript at 55:15-17, 56:1.  Bryan claimed that it was Kathy White, not Ahrensfield, who provided the names of the officers involved in the undercover investigation. *Id.* at

13

56:16-18. However, when Agent McCandless told Bryan "that doesn't have anything to do with you knowing [the name of one of the officers] on the 22nd" of September, Bryan stated that he "didn't know [the name of that officer] on the 22nd" and that he actually "didn't know it was [that officer] until late November . . . or early December" because "[t]hat's when we started finding out everything." *Id.* at 56:16-25. When questioned about the text messages at trial, Bryan testified that Darren White, through his wife, was getting information to Bryan about the investigation and that Darren White's wife was "texting [Bryan's] wife on a hourly, if not daily basis, giving us all the details of every little background thing that was going on with this investigation." Trial 2 Tr. at 272:8-11. When asked to clarify the exact time frame that the messages began, Bryan explained that White's wife began sending the messages "immediately . . . the morning that it all happened." Trial 2 Tr. at 273:16-25.

The district court found that this court would likely not apply a "knew or should have known" standard to information that a defendant could have learned by interviewing a witness and that a defendant's ability to obtain information from a witness has no bearing on whether the Government has suppressed evidence *or* whether evidence is material. *Doc. 170* at 22, Appendix at 426.  The court cited that if the Government were able to avoid its *Brady* obligations by asserting that the defendant could just as easily have gleaned the information from the witness

prior to trial, then the government would never have a duty to disclose exculpatory information that it learned prior to trial. In addition the court found that the information that the Government obtained from Bryan after the first trial was not information that Ahrensfield reasonably should have known existed. *Doc. 170* at 22, Appendix at 426.

The court concluded that Ahrensfield met his burden of showing that evidence regarding the text messages existed and that the Government was not relieved of its *Brady* obligations because Ahrensfield could have interviewed Bryan. The Court agreed with Ahrensfield that the number of details Ahrensfield provided to Bryan about the investigation was probative of Ahrensfield's intent; that the jury was required to infer Ahrensfield's intent from circumstantial evidence, and that the jury could have been persuaded that Ahrensfield did not intend to obstruct justice by evidence that someone other than Ahrensfield was the person who provided the specific details of the investigation to Bryan. The Court found that if the jury heard testimony that some of the details had come from an individual other than Ahrensfield, the jury may have reached a different conclusion as to Ahrensfield's guilt. However, the court also held that the jury did hear testimony that established that Bryan was aware of every detail of the investigation the morning of September 23, 2009 and that it had come from a source other than the text messages. The Court also found that the jury heard testimony elicited by

15

the defense that the majority of the details had come from Joe Hudson, not Ahrensfield. And, despite hearing testimony that Ahrensfield was not the source of a significant number of the details, the jury nevertheless returned a guilty verdict.

During his direct examination, Ahrensfield testified that he did not tell Bryan that Gilbert Montoya was the individual from whom the CI had purchased drugs. Ahrensfield testified that he did not even know that Montoya was involved. Trial 2 Tr. at 444:2. Ahrensfield said that when Bryan got into Ahrensfield's car, Ahrensfield only told Bryan that "your mechanic is dealing drugs." Trial 2 Tr. at 454. Bryan also testified that on September 22, 2009 Ahrensfield told Bryan that Ahrensfield had "heard a rumor that [Bryan was] a sergeant major of a crime ring." Trial 2 Tr. 77:8-10. When asked whether Ahrensfield had told him whether a CI was involved, Bryan testified that Ahrensfield had only told him "that they were talking to somebody; that somebody had started a rumor that [Bryan] was a drug dealing crime lord." TR 226:15-17. When confronted with his grand jury testimony, which differed from his trial testimony, Bryan explained that he had previously answered "yes" to the question of whether Ahrensfield had told him that there was a CI involved because he had been cornered into answering "yes" or "no" to questions. Trial 2 Tr. at 226.

When questioned about whether Ahrensfield had told him that he was suspected of dealing in stolen merchandise, Bryan testified that "it wasn't until the

next morning that I was told about the stolen goods thing." Trial 2 Tr. at 227:17-19. When asked whether Ahrensfield had told him that Gilbert Montoya was dealing drugs, Bryan stated "no, that is not true." Trial 2 Tr. at 228:13. When confronted with his grand jury testimony, in which Bryan stated that Ahrensfield had told him that "Gilbert was being suspected of dealing large amounts of drugs through the dealership," Bryan stated that it wasn't Ahrensfield that had told him about Gilbert Montoya, that it was "the gentleman right there [presumably an FBI agent]." Trial 2 Tr. at 228. After repeated questioning about whether Ahrensfield had named Gilbert Montoya, Bryan stated that Ahrensfield had "said that one of my employees was suspected of doing something wrong" and that "in the course of the next 12 hours, there was a lot of information gathered." Trial 2 Tr. at 233:22-25. Based on this information, Bryan was able to identify the employee as Gilbert Montoya. Bryan later noted that he had four conversations with Joe Hudson on the morning of September 23, 2009, that Hudson had told Bryan various details about the investigation, and that it was Hudson who had "mention[ed] Gilbert [Montoya's] name, [and] that Gilbert was suspected of some wrongdoing." Trial 2 Tr. at 294:8-22.

When asked about his meeting with Joe Hudson, Bryan testified that when he first met with Hudson, Bryan told Hudson that he had "been told that there was a rumor that we were being looked into and that I was being made out to be a

17

crime lord." Trial 2 Tr. 240:16-19. Bryan then stated that he had a meeting with Hudson "about an hour later, and [Hudson] elaborated into what was being said." Trial 2 Tr. 240:20. When asked whether he had given Hudson "all the details of the investigation that Brad Ahrensfield" had provided, Bryan testified that "that is not correct . . . Joe actually gave me more info than a rumor."  Trial 2 Tr. 241:4-5. Bryan explained that he told Hudson that he "had been told a rumor that [he] was suspected of running a crime organization" and that Hudson then "made phone calls and started getting details." Trial 2 Tr. 241:16-19. Upon further questioning, Bryan again reiterated that "a lot of info had been exchanged" between himself and Hudson, that he "didn't have anything from [Ahrensfield] but a rumor," and that while he "gave details of the investigation," the details did not come from Ahrensfield.  Trial 2 Tr. 243:5-9. When questioned about whether he knew the name of the CI, Bryan testified that he had learned the CIs name "over time." When asked to elaborate, Bryan explained that "after I visited with Joe Hudson and found out that there was an CI through our conversation, what this CI was saying, I did quickly figure out who [the CI] was." Trial 2 Tr. at 257:11-16.  Bryan went on to explain that "when Joe [Hudson] told me who - - - what the CI was saying, I did figure it out real quick, because he had come to my dealership." Trial 2 Tr. at 257:17-19.

On cross-examination, defense counsel asked Bryan a series of questions regarding the details that Ahrensfield had provided to Bryan about the investigation. When asked "[d]id Brad Ahrensfield ever tell you the name of the CI," Bryan replied "No, he did not." Trial 2 Tr. at 285 ln 4-6.  When asked "did Brad Ahrensfield ever tell you that Gilbert Montoya was going to be arrested," Bryan replied, "no, he did not.  He was actually not even involved in that. He - - he'd heard a rumor." Trial 2 Tr. at 285:7-10.  When asked "did Brad Ahrensfield even know they were focused on Gilbert Montoya," Bryan replied "no, he didn't. He knew that there was something going on, and it tied into my home and a whole lot of other things that had been going on. And we started putting pieces together the next morning."  Trial 2 Tr. at 285:11-17.

With respect to the audio recordings of Bryan's interview with the FBI and Bryan's phone call to the FBI, the Government conceded that Ahrensfield did not receive the audio recordings until after the trial concluded.  The court acknowledged that playing a recording of a witness's prior statement to a jury could certainly be a more effective way to impeach the witness's credibility than reading the statement from a transcript, but the Court disagreed that Ahrensfield's inability to play the recording was material.  The Court reasoned that because Ahrensfield read to the jury the portions of the transcript that Ahrensfield believed impeached Agent McCandless' testimony, there was no reasonable probability that

the result of the trial would have been different if the jury had heard that same evidence in a different form.  *Doc. 170* at 34, Appendix at 438.

Finally, concerning the laboratory report, the Ahrensfield defense learned of the contents of the lab report in an email from the prosecutor after trial.  In that email, the prosecutor indicated that the drug that was submitted to the laboratory tested positive for cocaine, not crack cocaine. The Government acknowledged that it did not provide Ahrensfield with a copy of the report, and thus conceded that the report was suppressed.  The Court found that the report was neither favorable nor material.

## SUMMARY OF ARGUMENT

The District Court erred by denying Ahrensfield's motion to dismiss for the government's suppression of *Brady* evidence during the second trial, for allowing the government to introduce evidence on which Ahrensfield was acquitted of, and for denying Ahrensfield's Motion for Judgment of Acquittal after the second trial.

### a.  The *Brady/ Giglio* Violations.

Ahrensfield's *Brady* motion identified numerous discovery violations- the failure to provide the transcripts of the interview and phone call until the middle of the second trial, the failure to provide the recordings of the interview and phone call until after the second trial and the complete failure to provide a laboratory report in both trials. *See Doc. 170 at 6*, Appendix at 410.

Without having the transcripts or the recordings (which was undeniably in the sole custody of the government and not provided to the defense), it was impossible for the defense to have known the potential value of the contents of the transcripts in order to make any use of them.  The District Court agreed that the transcripts were suppressed and favorable to the accused, but it erred in deciding that they were not material, and that the other suppressed evidence did not constitute a *Brady* violation.  The only element of *Brady* that the Court found was not met with respect to the transcripts and recordings was that they were not material.  The defense was severely prejudiced by the non-disclosure.

Pursuant to recent Supreme Court case law, there is no doubt the nondisclosure of a prior statement of a key witness such as Shawn Bryan is "plainly material" and a clear *Brady* violation.  At a minimum, justice requires a new trial to give Ahrensfield the full capability to use the entire discovery in this case, and not just the discovery the government thought was material to timely produce.

### b.  The Admission of Evidence Violated Double Jeopardy.

Ahrensfield should not have been forced to re-litigate the fact that he did not make false statements to FBI agents in relation to the obstruction of justice investigation.  He was acquitted of this conduct in the first jury trial, and the

introduction of evidence that he made false statements violated his Double Jeopardy rights.

### c. The Rule 29 Motion for Judgment of Acquittal.

The District Court should have granted Ahrensfield a directed verdict on the obstruction count. The District Court found the case to be "close". When the government retried the case, there was undeniably less evidence and less detail concerning Ahrensfield's role in the alleged offense. Additionally, there was some new evidence that exculpated Ahrensfield. Given there was insufficient evidence adduced in the second trial, a reasonable jury could not have found Ahrensfield guilty beyond a reasonable doubt.

### ARGUMENT

### I. THE DISTRICT COURT ERRED IN FINDING THAT THE EXCULPATORY EVIDENCE THE GOVERNMENT SUPPRESSED WAS NOT MATERIAL.

### a. Standard of Review.

The United States Court of Appeals for the Tenth Circuit reviews de novo the district court's denial of his motion for a new trial based on a *Brady* violation. A defendant who seeks a new trial based on an alleged Brady violation must show the elements of a *Brady* claim by a preponderance of the evidence. *United States v. Ford*, 550 F.3d 975 (10th Cir. Colo. 2008).

### b. Law.

"To establish a *Brady* violation, a defendant must demonstrate that (1) the prosecutor suppressed evidence; (2) the evidence was favorable to the defendant as exculpatory or impeachment evidence; and (3) the evidence was material." *United States v. Walters*, 269 F.3d 1209 (10th Cir. 2001) (quotation marks omitted). Whether a prosecutor acted in good or bad faith is irrelevant as "negligent or inadvertent suppression of evidence is nevertheless suppression for *Brady* purposes." *Fero v. Kerby*, 39 F.3d 1462, 1472 (10th Cir. 1994). If the Court concludes that a *Brady* violation has occurred, the Court has discretion to fashion an appropriate remedy to cure the violation. *See United States v. Burke*, 571 F.3d 1048, 1055 (10th Cir. 2009) (noting that "[t]he choice of remedy is in the sound discretion of the district court").

> Beginning with its seminal decisions in Napue v. Illinois, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959), and Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the Supreme Court established the principle that criminal convictions obtained by presentation of known false evidence or by suppression of exculpatory or impeaching evidence violates the due process guarantees of the Fourteenth Amendment. "[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." Giglio v. United States, 405 U.S. 150, 153, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972) (internal quotations omitted). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue, 360 U.S. at 269. The government's obligation to disclose exculpatory evidence does not turn on an accused's request. Strickler v. Greene, 527 U.S. 263, 280, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). "In order to comply with Brady, . . . the individual prosecution has a duty to learn of any favorable evidence known to the others acting on the government's behalf." Id. at 281 (quotation marks

omitted). Under this framework, no distinction is recognized between evidence that exculpates a defendant and "evidence that the defense might have used to impeach the [State's] witnesses by showing bias and interest." United States v. Bagley, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). We emphasize that the duty to disclose such information continues throughout the judicial process. Smith v. Roberts, 115 F.3d 818, 820 (10th Cir. 1997).

*Douglas v. Workman*, 560 F.3d 1156, 1173 (10th Cir. Okla. 2009).

The preferred remedy for a Brady violation is a new trial as opposed to a dismissal. *See United States v. Davis*, 578 F.2d 277 (10th Cir. 1978) (holding that "a violation of due process under *Brady* does not entitle a defendant to an acquittal, but only to a new trial in which the convicted defendant has access to the wrongfully withheld evidence").  This Court's prior decisions recognize that dismissal might be a permissible remedy, but that it is an extremely limited remedy reserved for flagrant abuses by the prosecution. *See United States v. Anderson*, 778 F.2d 602 (10th Cir. 1985).

As this Court noted, the good or bad faith of the prosecutor has no bearing on whether a *Brady* violation has occurred. *See United States. v. Gonzalez-Montoya*, 161 F.3d 643, 649 (10th Cir. 1998) (noting that "the term 'suppression,' in the Brady context, does not require a finding of a culpable state of mind" and that "good faith and bad faith . . . ha[s] no relevance if the government's conduct prejudices the outcome of the case") (quotation and alteration marks omitted).

Just last month the United States Supreme Court reiterated a prosecutor's *Brady* obligations, especially with respect to the materiality element. Chief Justice Roberts authored the 8-1 decision of *Smith v. Cain,* issued on January 10, 2012. In *Smith v. Cain*, Louisiana charged petitioner Juan Smith with killing five people during an armed robbery. At Smith's trial a single witness, Larry Boatner, linked Smith to the crime. He identified Smith as the first gunman to come through the door and testified that he had been face to face with Smith during the initial moments of the robbery. No other witnesses and no physical evidence implicated Smith. *Smith v. Cain*, 132 S. Ct. 627 (U.S. 2012). As part of postconviction proceedings, Smith obtained files including those of the lead investigator, Detective John Ronquillo. Ronquillo's notes contained statements by Boatner that conflicted with his testimony identifying Smith as a perpetrator. The notes from the night of the murder state that Boatner "could not ... supply a description of the perpetrators other then [sic] they were black males." Ronquillo also made a handwritten account of a conversation he had with Boatner five days after the crime, in which Boatner said he "could not ID anyone because [he] couldn't see faces" and "would not know them if [he] saw them." And Ronquillo's typewritten report of that conversation states that Boatner told Ronquillo he "could not identify any of the perpetrators of the murder" *Id.* The prosecution never disclosed these notes. Smith requested that his conviction be vacated, arguing, *inter alia,* that the

25

prosecution's failure to disclose Ronquillo's notes violated *Brady v. Maryland,* 373 U. S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).  The state trial court rejected Smith's *Brady* claim, and the Louisiana Court of Appeals and Louisiana Supreme Court denied review. The U.S. Supreme Court reversed and ordered a new trial.

Like the case at bar, the sole question before the Supreme Court was whether Boatner's statements were material to the determination of Smith's guilt. The Court explained evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict but that was not the case because Boatner's testimony was the only evidence linking Smith to the crime. *See also, Smith*, 50 F.3d at 827 "what might be considered insignificant evidence in a strong case might suffice to disturb an already questionable verdict.").  In addition, the Court stated that Boatner's undisclosed statements directly contradict his testimony and thus "Boatner's undisclosed statements were plainly material. " *Smith v. Cain*, 132 S. Ct. 627 (U.S. 2012).

The oral argument of *Smith v. Cain*[1] sheds light on the materiality element of the *Brady* doctrine, and on the prosecution's discovery obligations in general:

> JUSTICE GINSBURG:  But how could it not be material? Here is the only eyewitness-
> MS ANDRIEU:  Yes.
> JUSTICE GINSBURG:  --and we have inconsistent statements. Are you really urging that the prior statements were immaterial?

[1] Found at:  http://www.supremecourt.gov/oral_arguments/argument_transcripts/10-8145.pdf.

*Smith v. Cain* oral argument transcript, Pg. 29, lines 18-22.

> JUSTICE GINSBURG: How does that make it not material? You can argue that it should be given diminished weight. But an inconsistent statement by the only eyewitness seems to me most material and useful to the defense in cross-examining the eyewitness. I really don't understand how you can -- you can argue that the jury shouldn't put much weight on it because there were these other things; but to say that it's immaterial I find that that is -- is not plausible.

*Id.* pg. 31, lines 12-19.

> JUSTICE KENNEDY: But just on the materiality point, I -- I just have to agree with Justice Ginsburg.

*Id*. pg. 32, lines 9-10

> JUSTICE SOTOMAYOR: Is there a Brady violation under our holding in Kyles?
> MS. ANDRIEU: No, there is not.
> JUSTICE SOTOMAYOR: So, explain why what is on its face seemingly inconsistent statements are not required to be turned over.

*Id.* pg. 45, lines 2-6.

> MS. ANDRIEU: Because if they had been presented -- if those statements had been presented to defense -- or presented to a jury, the -- the outcome would have remained the same. The jury
> JUSTICE GINSBURG: How do you know? How do you know? How can you possibly know? The jury is supposed to decide on the credibility of this witness.  There's a statement that he made a prior inconsistent statement.

*Id*.at 47, lines 16-22.

> JUSTICE KAGAN: Did your office ever consider just confessing error in this case? You've had a bunch of time to think about it. You know? We took cert a while ago. I'm just wondering whether you've ever considered confessing error.

*Id.* at 50, lines 21-23.

JUSTICE GINSBURG: But you're taking that judgment away from the jury. There was a prior inconsistent statement. Shouldn't that be the end of it? A prior inconsistent statement, one that is favorable to the defense, has to be turned over, period.  I thought that was what Brady requires.

*Id.* at 51, lines 16-21.

### c. The Government Suppressed the Transcripts and Recordings of an Interview and Telephone Call With a Key Witness, Information Concerning Exculpatory Text Messages, as Well as a Lab Report that Constituted Impeachment Material.

As detailed in the Statement of Facts, Brady violations occurred upon the government's suppression of (1) CDs of an FBI interview of Bryan and an FBI call with Bryan on or about April 27, 2010 (CDs of either were never provided until after the second trial) (2) transcript of Bryan's interview with the FBI (provided mid-trial during the examination of Bryan); (3) transcript of Bryan's phone call with the FBI (not provided until the evidentiary hearing on the *Brady* motion); and (4) copy of the lab report of testing of the drug purchased by the CI from Gilbert Montoya on or about September 21, 2010 (lab report was provided to counsel, post-trial, by AUSA Greg Fouratt following up on a prior email from AUSA Tara Neda).

### 1. *Transcript of Telephone Call Suppressed During Trial, Even After the Government Was Put on Notice*

During the trial, when it became apparent that Ahrensfield and his lawyers had never been received copies of the two transcripts, Ms. Neda asked Ms. Murphy

28

to check if they were in the receptionist area, but gave her no further instructions to bring them to the trial. EH, Page 22, lines 3-18; Page 74, lines 1-25; Page 75, lines 1-11.  As a result of this lack of direction, during the trial and examination of Bryan and Agent McCandless, counsel for Ahrensfield only had the transcript of the interview of Bryan, and did not have the transcript of the telephone call between Bryan and the agents.  That transcript was suppressed.  In fact, counsel did not become aware that there was a separate recorded telephone call of Bryan until the evidentiary hearing, when the envelope, containing the transcript of the call was brought to court.  Knowing that Ahrensfield had not received the transcripts, remarkably this still did not trigger Ms. Neda to bring both transcripts to Court and provide them for counsel to use in cross examining Bryan and Agent McCandless.  As a result, counsel did not have access to the transcript of the recorded call in time to use in cross examination.

### 2. *Actual Tapes (CDs) Themselves Never Provided Until After Trial*

Defense counsel never received the actual CDs of the interview and phone call – as opposed to the transcripts – until after trial.  Counsel could have played the CDs and used the actual words of Bryan and the agents, their tone and demeanor, for the jury.  For example, in the highly coercive exchanges when the agents ask Bryan essentially to give them something on Brad Ahrensfield, in exchange for helping Bryan get to the bottom of who robbed his house, etc., this

could have been played, and the jury actually hear the agents make these quid pro quo statements, which would have obviously had a much greater impact.  Bryan testified to this quid pro quo arrangement offered by the FBI Agents. TT, Page 265, 17-25; Page 266, 1-20; Page 267, 7-17; Page 294, 23-25; Page 295 1-6.

### 3.  *Critical Evidence of Text Messages Suppressed*

Along with the suppressed taped interview and call, Bryan pointed out at trial that within that interview, he had brought up to the FBI Agents that his wife had received text messages from the wife of Darren White, his friend and current Director of Public Safety, the day after he talked to Brad Ahrensfield, and that Darren White had relayed extensive information about the investigation to Bryan through their wives.[2] TT, Page 270,13, 25; Page 272, 1-14.  White's wife was getting information to Bryan and his wife about the investigation. *Id.*  In the interview, Bryan told the FBI that they could subpoena text messages and learn the information that White had been giving Bryan.  The agents never subpoena'd the phone. TT, Page 272, 18-25; Page 273, 1-10.  The texts between the wives began "immediately" the morning it all happened and continued all day long. TT, Page 273, 19-25; TT, Page 275, 1-9. The defense had no knowledge about these messages.

---

[2] Shawn Bryan's wife, Erika Bryan, was willing and able to provide her phone to the agents.  TT, Page 296, lines 12-14.

The reason that this information was critical and material for the jury's consideration is that the jury could have believed that it was Public Safety Director Darren White or Officer Joe Hudson who supplied details about the investigation to Bryan as opposed to Brad Ahrensfield. Bryan explained that he had suffered a head injury and had memory problems and he found it difficult to remember exactly what was discussed, especially because he also talked to other people about the investigation.[3] TT, Page 275, 16-21; Page 276, 3-13; Page 284,3-9.

This was especially true given that Bryan related to the FBI Agents in the interview that his discussion with Brad Ahrensfield had been "vague" and only about "rumor". TT, Page 292, Lines 16-21; Page 294, lines 5-11.  In corroboration, Ron Olivas testified that he had not given Brad a "full briefing" on the night in question, which combined with the other evidence in the taped interview could have convinced the jury that the source of the leaked specific information had come from Darren White or Joe Hudson. TT, Page 338, lines 9-19.

### 4.  *Government Suppressed Lab Test*

After the second trial, defense counsel realized that the United States had failed to provide another document in discovery regarding the lab results of the drug that was purchased by the CI from Gilbert Montoya on or about September 21, 2010.  Counsel realized in reading the transcripts that this lab report – if it

---

[3] The record reflects that his head injury occurred during an IED explosion while Bryan was serving as a Marine in Iraq.

showed a test result for cocaine only - could have been used to rebut the idea that the drug purchased by the CI was "crack."   The reason this would be important in a federal obstruction case is to show that the underlying drug quantities had not, and were not, ever going to reach the level where there was going to be a federal proceeding to obstruct.

Moreover, the government repeatedly made a point during the trial that the purchase of "crack cocaine" would have been enough for federal prosecution, through the testimony of Buckner and FBI Special Agent Matt Boyden. TT, Page 88, Lines 3-24, TT, Page 89, Lines 4-18, TT, Page 94, Lines 1-25.  The point of this testimony was to convince the jury that a federal proceeding could and likely would have occurred but that Brad Ahrensfield's actions prevented such from happening.  Ms. Neda affirmatively asserted to this Court that a buy of "crack cocaine" in the amount of 7 grams exceeded the federal threshold for prosecution. This argument was made in front of the jury as well through the witnesses and Ms. Neda's statements.  TT, Pages 76-77, lines 23-25, 1-6.

However, after trial, in response to a query from the undersigned, in an email dated January 20, 2011, Ms. Neda explained that the lab report did exist and that it reflected that the drug tested positive for *cocaine* – not crack cocaine – and that it had not been sent out for secondary testing, but that Ryan Buckner's observations were consistent with the substance being crack. Ms. Neda further

32

stated that a copy of the lab report would be mailed, certified, to the undersigned. Counsel did not receive the lab report until after the Consolidated Brady motion was filed, well after the second trial.

Instead of providing the lab report before either of the two trials, the government made the unilateral decision that the document should not be provided because under the government's theory, the substance appeared to be crack cocaine anyway. This blatant violation of the *Brady/Giglio* cases and their progeny materially, adversely impacted Ahrensfield. Officer Ryan Buckner testified at trial that he tested he drug and it was positive for cocaine, not crack. Buckner just testified that it was "consistent with crack cocaine." TT, Page 73, lines 1-11. Had counsel had the lab report showing the substance tested for cocaine rather than crack, the defense could have confronted Buckner with it to impeach his testimony.

Ahrensfield's legal team would have cross examined both Officer Buckner and Agent Boyden on the fact that the substance tested positive only for cocaine, and that 7 grams of cocaine is far less than the federal threshold for prosecution. Given that the other buy was for ¼ pound of marijuana, this case never had the quantities of drugs necessary to go federal. Ms. Neda, by not providing the lab report to counsel, was essentially able without contrary evidence of any sort, to put before the jury that there was sufficient quantity of drugs to go federal and but for Ahrensfield's actions, they likely would have made a federal case. Obviously, this

is important as the federal obstruction statute requires intent to obstruct an "official proceeding" which in turn is defined only as a federal proceeding – federal grand jury, federal trial, etc. Even though Ahrensfield does not have to know under the law that a proceeding is or will be instituted, he does have to reasonably foresee that an official proceeding could be instituted. The government used this "crack" testimony and evidence to bolster its arguments to the jury that yes, a federal proceeding was not only foreseeable, it was imminent. By not ever having this lab report in either trial, Ahrensfield was deprived of powerful cross examination of the underlying facts of the drug purchases, which could have left the jury with a reasonable doubt that an "official proceeding", i.e. federal proceeding, would have ever been initiated. This information was material, could be used for cross examination, and was suppressed through both trials. *See also Napue v. Illinois*, 360 U.S. 264, 269-271 (1959) (conviction obtained through false evidence must fall under the Fourteenth Amendment, even if the "false testimony goes only to the credibility of a witness." "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence. . .").

### d. The Suppressed Evidence was Material and Exculpatory.

Taken together, the failure to provide the taped interview and phone call prior to trial deprived Ahrensfield of the ability to fully and completely prepare his defense. The suppressed tapes of interview and phone call contained materially

34

helpful information to Brad Ahrensfield's defense, as described above and in the

original and supplemental Brady Motions.  Suppression of that evidence also

prevented Ahrensfield from:

(1) Preparing extensive cross examination of Bryan and Drew McCandless,
    including playing excerpts of the tape when the Agents essentially floated a
    quid pro quo arrangement with Bryan that if he would give them anything
    criminal on Ahrensfield, they would help him investigate what had happened
    to Bryan and his house during the home break in and robbery;

(2) Obtaining through subpoena in a timely fashion, the phone of Erika Bryan,
    and have a computer expert retrieve the deleted text messages which Ms.
    Bryan had received from the wife of Darren White, which according to the
    unrebutted testimony of Bryan contained extensive details of the
    investigation, provided by Darren to his wife, and then to Erika Bryan and
    ultimately Bryan;

(3) Subpoena'ing for trial testimony KathyWhite and Erika Bryan, and
    questioning them about the test messages;

(4) Being fully prepared to use the portions of the tape in which Bryan says the
    conversation with Brad Ahrensfield was vague, and that the extensive detail
    came from Darren White and Joe Hudson.

Taken together with the failure to provide the taped interview and phone call with

Bryan, the suppression of the text messages, and the lab report, these constitutional and discovery violations were not harmless, and the outcome of the trial was assuredly impacted.  This is especially true in a case in which this Court in its Order on Ahrensfield's Rule 29 Motion described the facts as "very close", and upon which two juries deliberated for days, resulting in one hung jury, and a second jury only reached a verdict after a "shotgun" instruction was given, after that jury sent out a note that they had voted twice and were unable to reach a verdict. In cases where there is minimal evidence of guilt, evidence that might seem insubstantial may be sufficient to undermine confidence in the outcome of a trial.  *See e.g. Trammell v. McKune*, 485 F.3d 546, 552 (10th Cir. 2007) (noting that in "a close case," evidence that had the potential to undermine the testimony of eyewitnesses and corroborate the defendant's theory of the case was sufficient to undermine the court's confidence in the outcome of the trial even though the court was not convinced that timely disclosure of the evidence "would have resulted in a different result").

The Brady violation here was a result of the prosecutor's deliberate disregard for the government's obligations.  Although the District Court, on motion by the government, left this issue to another day, Ahrensfield's supplemental brief cited to numerous *Brady* violations, as well as instances of prosecutorial misconduct that this prosecutor, specifically, engaged in past cases.  In *United*

*States v. Torres*, 569 F.3d 1277 (10th Cir. N.M. 2009), AUSA Neda's *Brady*

violation resulted in reversal by this Court.  In *Torres*, AUSA Neda obtained

impeachment evidence related to a CI, and failed to disclose it prior to the trial. *Id.*

at 1277.  The defense's investigations led to the allegation that AUSA Neda "knew

that the CI had continued to engage in freelance drug dealing and forgery" during

the relevant period of time she was working on Torres' case. *Id.* at 1281.  In that

case, AUSA Neda also suppressed a document reporting a conversation in with the

CI made a misidentification. *Id.* at 1280.  In addition to *Brady* violations, AUSA

Neda has been named for other prosecutorial misconduct. *See, United States v.*

*Oberle*, 136 F.3d 1414 (10th Cir. N.M. 1998)(in which this court found that she

acted improperly, but that the prosecutorial misconduct did not deprive that

defendant of a fair trial); *United States v. Ramirez*, 63 F.3d 937 (10th Cir. N.M.

1995)(AUSA Neda was accused of prosecutorial misconduct and this court agreed

"that the prosecutor's statement was in fact improper counsel argument", but that

the error was harmless. *Id.* at 937); *United States v. Howell*, 285 F.3d 1263 (10th

Cir. N.M. 2002)(AUSA Neda was the prosecutor and defense claimed

prosecutorial misconduct and misrepresentation of the evidence.).  Ahrensfield

made a colorable claim for a pattern and practice of misconduct.

As to the prosecutor's deliberate disregard, it bears mentioning that the

government was in possession of the CDs of interview and phone call with Bryan

as early as April.  Those CDs were **never** produced to defense counsel until after the trial.  The transcripts were produced in waves during trial and after.  In addition, the lab report was intentionally withheld and not produced because of the government's unilateral theory that it wasn't pertinent.  Withholding of the CDs and lab report separate and apart from the transcripts also constitutes a deliberate disregard for discovery obligations.

Should this Court find that there was a *Brady* violation, but nonetheless agree with the District Court that the prosecutor did not act intentionally, the appropriate remedy would be a new trial.  However, this Court could also respectfully reverse the decision of the District Court, and remand the matter for the District Court to determine whether the prosecutor acted in bad faith or deliberate disregard of discovery obligations, such that a dismissal would be the appropriate remedy.

## II.    THE DISTRICT COURT ERRED BY ALLOWING THE GOVERNMENT TO INTRODUCE EVIDENCE OF AHRENSFIELD MAKING ALLEGED FALSE STATEMENTS TO THE FBI BECAUSE THE JURY ACQUITTED HIM OF SUCH CONDUCT IN THE FIRST TRIAL.

### a.  Standard of Review

While the appellate court reviews the factual findings underlying the defendant's double jeopardy claim for clear error, the district court's ultimate

determination regarding double jeopardy is a question of law reviewd de novo.

*United States v. Crook*, 213 Fed. Appx. 754, 758 (10th Cir. Okla. 2007).

### b. The Double Jeopardy Clause Bars Re-Litigation of the False Statements Allegations.

The Double Jeopardy Clause "embodies two vitally important interests."

*Yeager v. United States*, 129 S. Ct. 2360, 2365 (U.S. 2009). First, the Clause

protects the "traditional principles of double jeopardy." The traditional principles

stand for the "deeply ingrained principle that the State with all of its resources and

power should not be allowed to make repeated attempts to convict an individual for

an alleged offense." *Id.* It is well settled that the Double Jeopardy Clause,

"precludes the Government from relitigating any issue that was necessarily decided

by a jury's acquittal in a prior trial." *Yeager*, 129 S. Ct. at 2366 (*citing, Ashe v.

Swensen*, 397 U.S. 436, 90 S. Ct. 1189 (1970)). It "protects a man who has been

acquitted from having to 'run the gauntlet' a second time." *Ashe*, 397 U.S. at 446

(internal citations omitted).

The second interest protected by the Double Jeopardy Clause is the

"preservation of the finality of judgment." *Yeager*, 129 S. Ct. at 2366. This interest

is referred to as "collateral estoppel." *See United States v. Wittig*, 575 F.3d 1085,

1098 (10th Cir. 2009). "When an issue of ultimate fact has once been determined

by a valid and final judgment of acquittal, it 'cannot again be litigated' in a second

trial for a separate offense." *Yeager*, 129 S. Ct. at 2367 (*quoting Ashe*, 397 U.S. at 443).

In applying the doctrine, "the court must ask two questions:  First, is the issue the defendants wish to foreclose from trial the actual basis for their prior acquittal?  Second, is the same issue necessary to the prosecution's case in this proceeding?  If both questions yield affirmative answers, collateral estoppel bars retrial of the issue." *Ashe*, 397 U.S. at 433, 90 S. Ct. 1189; *Wittig*, 575 F.3d at 1098.  To determine precisely what findings are encompassed within a jury's verdict, the Court should examine the record of the prior proceeding, including pleadings and evidence, and decide whether or not the jury grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration at a subsequent trial. *Yeager*, 129 S. Ct. at 2367, 90 S. Ct. 1189.

Admitting evidence pertaining to the acquitted count in the retrial violated Ahrensfield's Double Jeopardy rights under the Fifth Amendment to the U.S. Constitution. The jury instruction for false statements, from which Ahrensfield was acquitted of provided:

> *First:*  the defendant made a false, fictitious or fraudulent statement or representation to the government; specifically:
>
>     a.  The defendant had no knowledge of the investigation of Car Shop;
>     b.  The defendant had not communicated with Ron Olivas about the investigation of Car Shop; or

c. The defendant had not told Bryan about the investigation of Car Shop.

*Second:* the defendant made the statement knowing it was false;

*Third:* the defendant made the statement willfully, that is deliberately, voluntarily and intentionally;

*Fourth:* the statement was made in a matter within the jurisdiction of the executive branch of the United States Government, and

*Fifth:* the statement was material to the Federal Bureau of Investigation.

In the government's retrial of Ahrensfield on the obstruction of justice count, the government was required to prove that Ahrensfield knowingly, willfully, and corruptly obstructed, influenced and impeded an official proceeding, namely, a Federal Grand Jury investigation, that would result from the joint task force's investigation of possible violations of federal criminal laws in violation of 18 U.S.C. § 1512(c)(2).

*Yeager* involved criminal charges of fraud and insider trading. The jury acquitted on the fraud counts but failed to reach a verdict on the insider trading counts. *Id.* The government attempted to retry the defendant, and the defense argued that the jury's acquittals in the first trial necessarily decided critical facts that the government would be required to prove again at retrial, and that the issue-preclusion component of the Double Jeopardy Clause barred a second trial. *Id.* The

trial court denied the motion and the appellate court affirmed.  However, the

Supreme Court reversed. *Id.* at 2367.

The district court here denied Ahrensfield's motion based on its distinction

that the issue decided in the first trial was not an element of the charges submitted

to the jury in the second trial. *Doc. 93* at 5, Appendix at 62.  However, this

distinction was only relevant if Ahrensfield were requesting complete dismissal of

the charges.  Ahrensfield's motion, however, requested that the Court either

exclude evidence offered by the government that Ahrensfield made false

statements, or allow such evidence, but allow a curative instruction or for

Ahrensfield to alert the jury to the fact that he was acquitted of the false statements

charge.  Any statements or evidence pertaining to the count involving false

statements was already presented to a jury, and a jury already determined those

issues.  Therefore, admitting evidence pertaining to the false statements count

violated Ahrensfield's Fifth Amendment Rights, essentially because Ahrensfield

was again forced to rebut those allegations in the second trial.

The district court also speculated that a jury could have rationally acquitted

Ahrensfield on an issue other than whether he made a false statement, such as the

statement was not material. *Doc. 93* at 7, Appendix at 64.  However, what the

jury's verdict meant was that considering all the evidence and hearing all the

testimony throughout the course of the trial, Ahrensfield was not guilty of making

false statements to law enforcement.  A jury's verdict of acquittal represents the

community's collective judgment regarding all the evidence and arguments

presented to it." *Id.* at 2367.  Therefore, the government was precluded under the

doctrine of collateral estoppel from attempting to introduce any testimony or

evidence to the contrary during the retrial, including using this acquitted conduct to

prove "consciousness of guilt".

It is simply not in the interests of justice or in the spirit of the Double

Jeopardy Clause for the government to be able to carte blanche introduce evidence

that goes to the core of what someone was acquitted of, and for the jury to be in the

dark that he was actually acquitted of it.  The district court did not discuss

Ahrensfield's proposed remedies of allowing him to tell the jury that he was

acquitted of the crime of making false statements.  That remedy was used in *United*

*States v. Rey*, 2010 U.S. Dist. LEXIS 24021 (D.N.M. Mar. 2, 2010) when the

District Court, acknowledging that there were collateral estoppel and double

jeopardy concern, allowed an instruction to the jury on the previous acquittal. This

would have been an appropriate remedy in this case to ensure that Ahrensfield was

not forced to rebut allegations of which he was already acquitted. *See, United*

*States v. Hicks*, 2010 U.S. Dist. LEXIS 41865 (W.D. Va. Apr. 28, 2010)(Court

excluded evidence of facts Defendant was acquitted on because "[t]he jury's

acquittal for those charges clearly determined that Hicks did not knowingly make,

or assist with the making of, a false material misrepresentation on the six dates in question."); *United States v. Seley*, 957 F.2d 717 (9th Cir. Ariz. 1992)(The government was collaterally estopped from introducing at retrial evidence that defendant knew illegal drugs were stashed in his truck when it crossed the Mexican border because the issue had been litigated in defendant's first trial").

### III.   THE DISTRICT COURT ERRED IN DENYING AHRENSFIELD'S MOTION FOR JUDGMENT OF ACQUITTAL UNDER FED.R. CRIM.P. 29.

#### a.  Standard of Review.

Under Rule 29(b), in the event the case is submitted to the jury, the trial judge may decide a defense motion at any time before or after the jury returns its verdict or after the jury has been discharged for failure to agree on verdict.  Fed. R. Crim. P. 29(b).  This court reviews de novo the sufficiency of the evidence to support a conviction. *United States v. Colonna*, 360 F.3d 1169, 1178 (10th Cir. 2004).  "In reviewing the district court's refusal to direct a verdict of acquittal, this court must determine whether, viewing the evidence in a light most favorable to the prosecution, there was substantial evidence, together with reasonable inferences drawn therefrom, that would sustain the verdict." *United States v. Tager*, 481 F.2d 97, 100 (10th Cir. 1973).  A *de novo* standard of review applies to this issue. *United States v. Flanders*, 491 F.3d 1197, 1207 (10th Cir. 2007).

### b. Law.

To obtain a conviction for a violation of § 1512 (c)(2), the United States is required to prove each of the following elements beyond a reasonable doubt:

> 1) the Defendant acted knowingly, that is, voluntarily and intentionally and not by mistake or accident;
>
> 2) the Defendant obstructed, influenced, or impeded or attempted to obstruct, influence, or impede an official proceeding;
>
> 3) the Defendant acted corruptly, that is, that the Defendant acted knowingly and dishonestly with the wrongful purpose to obstruct, influence or impede the due administration of justice; and,
>
> 4) the Defendant's alleged actions had a relationship in time, causation, or logic with the proceeding such that it was foreseeable that Defendant's conduct would interfere with the proceeding.

In other words, the Government must prove beyond a reasonable doubt that obstruction of an official proceeding was the natural and probable outcome of Defendant's conduct. *See Doc.78,* Appendix at 14, *Memorandum Opinion and Order, citing* 18 U.S.C. § 1512 (c)(2); *United States v. Phillips*, 583 F.3d 1261, 1263-64 (10th Cir. 2009); Tenth Circuit Pattern Jury Instruction 1.37 (defining "knowingly"); *see also Arthur Anderson, LLP v. United States*, 544 U.S. 696, 705 (2005).

In *United States v. Aguilar*, 515 U.S. 593 (1995), a jury convicted United States District Judge Robert Aguilar of one count of illegally disclosing a wiretap in violation of 18 U.S.C. § 2232(c), and of one count of obstructing justice, 18

U.S.C. § 1503. *Aguilar,* at 595.  Aguilar, a United States District Judge, was

convicted of illegally disclosing a wiretap, even though the authorization for the

particular wiretap had expired before the disclosure was made. Because he lied to

Federal Bureau of Investigation (FBI) agents during a grand jury investigation, he

also was convicted of obstructing justice. The Court of Appeals reversed both

convictions, reasoning that Aguilar's conduct in each instance was not covered by

the statute.  The United States Supreme Court granted certiorari.

> In affirming, the Supreme Court held:

> > "A person is not sufficiently charged with obstructing or impeding the due administration of justice in a court unless it appears that **he knew or had notice** that justice was being administered in such court." *Id.*, at 206.[4] The Court reasoned that a person **lacking knowledge** of a pending proceeding necessarily lacked the evil intent to obstruct. *Id.*, at 207. Recent decisions of Courts of Appeals have likewise tended to place metes and bounds on the very broad language of the catchall provision. The action taken by the accused must be with an intent to influence judicial or grand jury proceedings; **it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority**.
> > …
> > But as in *Pettibone*, **if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct.**
> > …
> > We do not believe that uttering false statements to an investigating agent--and that seems to be all that was proved here--who might or might not testify before a grand jury is sufficient to make out a violation of the catch-all provision of § 1503. *Id.* at 600 (emphasis added).

---

[4] *Quoting, Pettibone v. United States*, 148 U.S. 197, 37 L. Ed. 419, 13 S. Ct. 542 (1893).

The Supreme Court further held:

> Such conduct, we believe, falls on the other side of the statutory line from that of one who delivers false documents or testimony to the grand jury itself. Conduct of the latter sort all but assures that the grand jury will consider the material in its deliberations. But what use will be made of false testimony given to an investigating agent who has not been subpoenaed or otherwise directed to appear before the grand jury is far more speculative. We think it cannot be said to have the "natural and probable effect" of interfering with the due administration of justice. *Id.* at 601.

In *United States v. Phillips,* 583 F.3d 1261 (10th Cir. 2009), the Defendant revealed the identity of an undercover agent to a dealer of methamphetamine. At the time the Defendant revealed this information, a federal grand jury investigation was underway. Law enforcement officers had testified before the grand jury and had obtained wiretap orders and grand jury subpoenas. Subsequent to the federal grand jury proceedings, the Defendant revealed the Officer's identity. The Defendant argued that the evidence only demonstrated that he was aware Officer Bice was a policeman, not that he was aware of an ongoing or future federal grand jury investigation. He argued that this evidence was insufficient to establish the requisite mens rea under § 1512(c)(2). *Id.* at 1264. This Court stated:

> [A] reasonable jury could conclude that the natural and probable effect of disclosing Officer Bice's identity was impeding a federal grand jury investigation into Ms. Lopez's methamphetamine distribution and her supply source. Indeed, given the evidence presented at trial, a jury could find that Mr. Phillips had no purpose other than to thwart such an investigation. The evidence and reasonable inferences therefrom tended to show that Mr. Phillips

47

> knew: (1) Officer Bice was a law enforcement officer; (2) he had been
> or would be attempting to make controlled purchases from Ms. Lopez;
> and (3) at least two other methamphetamine distributers in Dodge City
> had been arrested in the approximately ten preceding months. The
> jury also heard extensive evidence that Mr. Phillips consistently
> boasted to law enforcement officers that he had "burned" Officer Bice,
> which begs the inference that he actually intended to obstruct the
> investigation into the methamphetamine trade in Dodge City--of
> which the federal grand jury proceedings were a necessary part...

In *Arthur Andersen LLP v. United States*, 544 U.S. 696 (U.S. 2005), as

Enron Corporation 's financial difficulties became public, Defendant, Enron 's

auditor, instructed its employees to destroy documents pursuant to its document

retention policy.  However, no grand jury was convened regarding the matter.  The

Defendant was charged with obstruction of justice, 18 U.S.C. § 1512.  The

government, in resisting any type of nexus element, relied heavily upon 18 U.S.C.

§ 1512(e)(1), which states that an official proceeding "need not be pending or

about to be instituted at the time of the offense." *Id.* at 707.  In reversing the

conviction, the Supreme Court held: "It is, however, one thing to say that a

proceeding 'need not be pending or about to be instituted at the time of the

offense,' and quite another to say a proceeding need not even be foreseen.  A

'knowingly . . . corrupt persuader' cannot be someone who persuades others to

shred documents under a document retention policy when he does not have in

contemplation any particular official proceeding in which those documents might

be material." *Id.* at 707-708.  The phrase "in contemplation" means with thought of

a particular official proceeding.  Thus, a Defendant must contemplate within his

mind a particular official proceeding and that that proceeding will be obstructed by

his conduct to violate the statute. *See also, United States v. Quattrone*, 441 F.3d

153 (2d Cir. 2006) (Defendant's conviction was vacated and remanded because

jury instructions on 18 U.S.C. § 1512 were insufficient because district court

erroneously stated that no nexus element applied to that charge).

### c.  The Evidence is Insufficient to Support Each Element.

In order to prove the first element of **"knowingly"** the government was

required to establish that Ahrensfield "acted knowingly, that is, voluntarily and

intentionally and not by mistake or accident."  At the first trial, the Court

determined that the government met that burden because:

> "Shawn Bryan's testimony that Ahrensfield contacted Bryan, arranged
> a meeting between the two, and directly told Bryan various details of
> the Car Shop investigation without prompting would lead any
> reasonable jury to conclude that Ahrensfield acted knowingly, and not
> by mistake or accident, in disclosing those details."

*Doc. 78* at 12, Appendix at 25.   In the second trial, however, there were fewer

facts, less detail and less evidence before the jury surrounding the meeting between

Ahrensfield and Bryan.  A reasonable jury could not have concluded that

Ahrensfield "knowingly" obstructed an official proceeding.  The district court

erroneously drew a distinction between whether Ahrensfield acted knowingly

"when he met with Bryan" instead of whether he knowingly obstructed a

proceeding. *Doc. 171* at 12 FN2, Appendix at 452.  The court stated that Ahrensfield did not "cite any authority for his proposition that this element of the offense requires that Ahrensfield knowingly obstruct a proceeding rather than that Ahrensfield merely have acted knowingly." *Id.*  On the contrary, Ahrensfield discussed extensively the proposition laid down in *Aguilar* that if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct.  This is separate from the government's obligation to prove that he acted "corruptly" or that he intended to obstruct an "official proceeding".  While Ahrensfield knowingly met with Bryan that night, that fact does not, as the District Court claims prove the element of "knowingly" in relation to the obstruction of justice charge.  The testimony demonstrated that Ahrensfield did not know that his actions were likely to affect a judicial proceeding because he did not even know details about the investigation.  In fact, no judicial proceeding ever existed in this case.  Simply put, Brad Ahrensfield did not **knowingly** act to obstruct an official proceeding.

With respect to the second element, Ahrensfield argued that there was no intent to **obstruct an official proceeding** because the only evidence was that Ahrensfield told Bryan about a rumor surrounding his dealership and that an employee was doing wrongful things at Bryan's business.  Ahrensfield did not identify which employee was involved or the identity of any CI, or that a CI was

being used.  There was no evidence that Ahrensfield told Bryan that the FBI and

APD were investigating Bryan and his business or any form of investigative

techniques being employed. The Court agreed, but stated:

> The Court agrees that Bryan's testimony at the second trial was much
> more equivocal with respect to the exact information that Ahrensfield
> provided to Bryan and that Bryan did not identify Ahrensfield as the
> individual who provided Bryan with the majority of the details about
> the undercover operation.  Nevertheless, Bryan's testimony at the
> second trial undisputedly established that Ahrensfield told Bryan that
> there was an investigation and that Bryan was suspected of running a
> criminal enterprise out of Car Shop.  Based on this evidence alone, the
> Court would conclude that the Government presented sufficient
> evidence to allow the jury to find that Ahrensfield intended to obstruct
> an official proceeding when he told Bryan that there was a rumor that
> Bryan was running a criminal enterprise. *Doc. 171* at 13, Appendix
> 453.

This reasoning completely misses the argument Ahrensfield made about how

the statute at issue, 18 U.S.C. § 1512(c)(2), does not criminalize obstruction of an

**investigation**, nor does it reach as expansively as the United States would like it to

reach. *See Aguilar*, 515 U.S. at 599 ("it is not enough that there be an intent to

influence some ancillary proceeding, such as an investigation independent of the

court's or grand jury's authority.").  The Court erred because it found Ahrensfield

obstructed an official proceeding based solely on the fact that Ahrensfield told

Bryan there was an investigation and that Bryan was suspected of running a

criminal enterprise.  The Court did not discuss that intent to obstruct an

**investigation** is not the same as obstructing an "official proceeding". 18 U.S.C.

§ 1515(a)(1)(A) defines "official proceeding" in pertinent part as:

> A. a proceeding before a judge or court of the United States, a United States magistrate, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Claims Court, or a Federal grand jury;

Thus the very definition of official proceeding requires that it be federal in nature; in this case, a federal grand jury investigation.

It is also important for the Court to consider the structure of the various obstruction statutes. Congress enacted the statute subsection at issue, 1512(c)(2), as part of the Sarbanes-Oxley Act in 2002 in response to the "widespread and pervasive" problem of witness tampering. S. Rep. 532, 97th Congress, 2d Sess. 15, reprinted in 1982 U.S. Code Cong. & Admin. News, 2515, 2521. Obviously, there was no "witness tampering" here, but it serves to show once again what a stretch the government is making in this case. Given this legal backdrop, the most the United States proved was that Ahrensfield was aware of a pending **investigation** of the Car Shop and that he told that to Bryan. This information about an investigation fits squarely within the holding in *Aguilar* as innocent statements that do not run afoul of § 1512. Just like Judge Aguilar who leaked details of a wiretap but lacked knowledge or intent to obstruct an official proceeding, so did Brad Ahrensfield lack knowledge or intent to obstruct an official proceeding.

The government did not show that Ahrensfield had knowledge of an official proceeding and that he intended to obstruct that proceeding. Moreover, at no time did Ahrensfield tamper with any witnesses or CIs – the purpose of the statute. In fact, his statements to Bryan did not include that Mr. Montoya was going to be arrested or that anyone was going to be arrested. For all Brad Ahrensfield knew at the time, there were some details about possible criminal activity at the Car Shop but he did not know that any such activities were happening or that the situation would lead to the opening of a federal grand jury at some point in time. Obstruction of an ancillary proceeding, such as an investigation, does not violate the statute.

Moreover, the government attempted to exploit of the idea that Ahrensfield's statements to Bryan "shut down" the investigation. Yet, what was abundantly clear was that the government proceeded with the plan exactly as intended, that is, they covertly arrested Gilbert Montoya away from the dealership, and debriefed him and attempted to have him "roll" on Bryan. The undisputed evidence at trial was that Bryan never told Gilbert Montoya about his conversation with Brad Ahrensfield prior to law enforcement arresting Gilbert and debriefing him. Thus, statements by Brad Ahrensfield had no impact on the continuing investigation.

The Court found sufficient evidence to support the element that Ahrensfield acted **corruptly** "when he informed Bryan that there was an ongoing undercover

investigation of Bryan and Car Shop." *Doc. 171* at 17, Appendix at 457. However, Ahrensfield did not provide specific details, because he did not know specific details about the investigation. All Ahrensfield told Bryan was a general rumor of criminal activity involving an employee of Car Shop. That is not acting "corruptly". *See United States v. Erickson*, 561 F.3d 1150, 1160 (10th Cir. 2009)(noting that "an act is done 'corruptly' when done with the purpose of obstructing justice"). The Court further erred on this element by finding that a jury could reasonably infer that "Ahrensfield wrongfully intended to assist Bryan in evading eventual prosecution, in which a grand jury would necessarily be involved, and alert Bryan of the need to take protective measures, such as destroying evidence and devising explanations for any suspicious activity, if Bryan in fact was engaged in criminal activity." *Doc. 171* at 18, Appendix at 458. However, the jury could not possibly have concluded that because there was absolutely no evidence, implicit or otherwise, that Ahrensfield ever instructed the destruction of any evidence or otherwise assisted Bryan in avoiding prosecution.

The final element required the government to prove that Ahrensfield's actions were sufficiently close in time, causation, or logic with an official proceeding to satisfy the **nexus requirement**. Again, because in the second trial, Bryan's testimony did not show that Ahrensfield told Bryan details of the investigation, but only generalized rumors, there was insufficient evidence. The

testimony in the second trial about the circumstances of the meeting between

Ahrensfield and Bryan were not 'nefarious'.  There was no evidence that

Ahrensfield revealed the identity of the CI to Bryan or revealed that a confidential

source was being used, and there was evidence that Joe Hudson supplied details to

Bryan. *See Trial II Transcript,* Page 220, lines 4-10; Page 223, lines 18-25; Page

240, line 6-21.  Bryan testified that Hudson actually gave him more information

about the investigation than Ahrensfield. TT, Page 242, lines 1-19.

The conduct here does not meet the nexus element, even in the light most

favorable to the government.  In *Phillips*, there was a grand jury investigation

underway, a wiretap and grand jury subpoenas were ordered.  Critically important

there, the Defendant bragged afterwards about "*burning*" phthe officer, which this

court said "begs the inference that he actually intended to obstruct the

investigation." *Id.* at 1265.  In *Phillips,* there was evidence that would allow a jury

to infer knowledge of the proceeding, to wit, other persons had been arrested over

the preceding months and the defendant bragging about "burning" the officer.  This

case is factually distinct from *Phillips* in that there is no such evidence of intent or

knowledge.

Here, no grand jury would ever foreseeably be convened because the

ultimate goal of the investigation was a **hope** that Montoya would implicate Bryan

in criminal activity that **could potentially** empanel a grand jury investigation.

The fact that Montoya was interrogated and did notinculpate Bryan is relevant to the element of foreseeability.  Additionally, the nexus element is not met because even assuming Bryan was implicated, there was no evidence that the investigation would ever foreseeably meet the federal threshold for drugs.  It could not have been foreseeable to Ahrensfield if it was arguably not even foreseeable to the investigating agents.

In the first trial, Buckner unequivocally testified that the second drug purchase was crack: "the plan was to utilize the same CI to make a controlled purchase of a quarter ounce of crack cocaine from Gilbert Montoya at the Car Shop." *Testimony of Ryan Buckner, Trial I, Volume II, Page 73, Lines 16—18.* In fact, in opposing a judgment of acquittal in the first trial, the government argued that the purchase was for "¼ ounce of **crack** cocaine" and "had the plan gone forward, Montoya would have been facing a mandatory minimum sentence of five years imprisonment under 21 U.S.C. §§ 841 (a)(1) and (b)(1)(B)" for the purchase of crack. *Governments Response to Motion for Judgment of Acquittal, Trial 1, Doc. 75, page 5*, Appendix at 9.  In the second trial, however, Ryan Buckner testified that he tested the drug purchased from Montoya and it was positive for cocaine, but that he could not tell the jury that he knew for sure it was crack, only that "it was consistent with [being] crack". Page 72, Lines 24-25; Page 73, Lines 1-13; 22-25; Page 74.

In the second trial it became apparent that there never was the quantity of drugs to make a federal case. This makes satisfaction of the nexus element even further attenuated. There is no evidence that a federal grand jury proceeding was contemplated by the Defendant especially where the most evidence the task force had was low-level drug buys. *See, Arthur Andersen,* supra.

Therefore the main facts, based on Bryan's testimony that the Court focused on in the first trial when denying Ahrensfield's motion on a "close call" came out differently, and more favorably to the defense in the second trial, to the point that there were no hard details whatsoever of an intent to obstruct a proceeding. Also, there was nothing that came out more favorably for the government. In fact, there were additional items such as the drugs possibly not being crack, the interview between Bryan and the agents after the first trial, and the information about Darren White and his wife as a source of the leak that were not brought out in the first trial. As a result, while the first trial may have been a "close call", in the second trial, the government did not meet its burden of proof and Ahrensfields' motion should have been granted.

## CONCLUSION

Wherefore Ahrensfield respectfully requests this court reverse the decision of the District Court which denied his Motion to for Acquittal, allowed evidence of acquitted conduct before the jury and denied his Motion to Dismiss or for a New Trial for Brady/Giglio Violations.

Respectfully submitted,

/s/ Jason Bowles
Jason Bowles
B.J. Crow
Monnica L. Garcia
Bowles and Crow
Post Office Box 25186
Albuquerque, New Mexico 87125
Telephone: (505) 217-2680

## STATEMENT ON ORAL ARGUMENT

Oral argument is requested as the issues raised in this appeal involve, as the district court indicated, "close" legal questions.  This case also involves, for the first time in this circuit, the application of new precedent as set forth in *Smith v. Cain* on the materiality element of *Brady v. Maryland*.

## STATEMENT OF COMPLIANCE

The undersigned counsel certifies that:

This brief was prepared in Microsoft Word 2010 using a proportionally-spaced type style or typeface with 14 point type.  The number of words contained in the body of this brief is 13,910.

/s/ Jason Bowles
Jason Bowles

## CERTIFICATE OF DIGITAL SUBMISSION

The undersigned counsel certifies that:

1.      there were no privacy redactions to be made in the foregoing brief for Brad Ahrensfield, and the Digital Form version e-mailed to the Court on this day is an exact copy of the written document that was sent to the Clerk;

2.      The Digital Form version of this brief for Brad Ahrensfield emailed to the Court on this day has been scanned for viruses with ESET NOD32 Antivirus, version 3.0.695.0, which is continually updated, and according to that program is free of viruses.

/s/ Jason Bowles
Jason Bowles

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was filed through this Court's EM/ECF and by and to counsel for the United States on this 21st day of February, 2012 to:

Ms. Tara Neda
Mr. Gregory Fouratt
Assistant United States Attorney
P.O. Box 602
Albuquerque, N.M. 87103


<u>/s/ Jason Bowles</u>
Jason Bowles

## **ADDENDUM**

Memorandum Opinion and Order, Document 93
Memorandum Opinion and Order, Document 170
Memorandum Opinion and Order, Document 171
Transcript of Suppressed Interview with Shawn Bryan