ORAL ARGUMENT IS REQUESTED

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

---

No. 11-2198

UNITED STATES OF AMERICA,
Plaintiff/Appellee,

vs.

BRAD AHRENSFIELD
Defendant/Appellant.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
Honorable James A. Parker, United States District Judge

# DEFENDANT/APPELLANT'S
# CORRECTED REPLY BRIEF

Jason Bowles
B.J. Crow
Monnica L. Garcia
Bowles and Crow
P.O. Box 25186
Albuquerque, N.M. 87125
Telephone: (505) 217-2680
Facsimile: (505) 217-2681
Email:
Jason@bowlesandcrow.com
bj@bowlesandcrow.com
Monnica@bowlesandcrow.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii, iii

RESPONSE TO THE GOVERNMENT'S "EVIDENCE ADMITTED
DURING THE UNITED STATES' CASE-IN-CHIEF" . . . . . . . . . . . . . . . . . . . 1

THE BRADY VIOLATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

 THE FALSE STATEMENTS/DOUBLE JEOPARDY ISSUE . . . . . . . . . . . . . 17

THE JUDGMENT OF ACQUITTAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

STATEMENT OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CERTIFICATE OF DIGITAL SUBMISSION . . . . . . . . . . . . . . . . . . . . . . . . 29

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

## United States Supreme Court Cases

Arthur Andersen LLP v. United States, 544 U.S. 696 (U.S. 2005) . . . . . . . . . . . 24

Brady v. Maryland, 373 U. S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) . . . . . . 6

Dowling v. United States, 493 U.S. 342 (U.S. 1990) . . . . . . . . . . . . . . . . . . . . . . 18

Smith v. Cain, 132 S. Ct. 627 (U.S. 2012) . . . . . . . . . . . . . . . . . . . . 7, 8, 9, 12, 13

Yeager v. United States, 129 S. Ct. 2360(U.S. 2009)  . . . . . . . . . . . . . . . . . . . . . 18

## 10th Circuit Court of Appeals Cases

Banks v. Reynolds, 54 F.3d 1508 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 16

Jordan v. Bowen, 808 F.2d 733 (10th Cir.), cert. denied,
484 U.S. 925, 98 L. Ed. 2d 247, 108 S. Ct. 287 (1987) . . . . . . . . . . . . . . . . . . . . 12

United States v. Knox, 124 F.3d 1360, 1364 (10th Cir. Okla. 1997)  . . . . . . . . . . 4

United States v. Phillips, 583 F.3d 1261 (10th Cir. 2009) . . . . . . . . . . . . . . . 21, 22

United States v. Walters, 269 F.3d 1209 (10th Cir. 2001) . . . . . . . . . . . . . . . . . 10

United States v. Wittig, 575 F.3d 1085, 1098 (10th Cir. 2009) . . . . . . . . . . . . . . 18

## Other Circuit Cases

United States v. Balliviero, 708 F.2d 934 (5th Cir. 1983)  . . . . . . . . . . . . . . . . . . 4

United States v. Mornan, 413 F.3d 372, 379 (3d Cir. 2005) . . . . . . . . . . . . . . . . . 4

United States v. Quattrone, 441 F.3d 153 (2d Cir. 2006) . . . . . . . . . . . . . 21, 24, 27

## Federal District Court Cases

United States v. Rey, 2010 U.S. Dist. LEXIS 24021 (D.N.M. Mar. 2, 2010) . 19, 20

**<u>Statutes</u>**

18 U.S.C. § 1512 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

18 U.S.C. § 1515 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

21 U.S.C. § 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 26

**<u>Rules</u>**

10th Cir. R. 10.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. App. Proc. 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 17

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Fed. R. Evid. R. 801(d)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## I.     RESPONSE TO GOVERNMENT'S "EVIDENCE ADMITTED DURING THE UNITED STATES' CASE-IN-CHIEF"

The government presents a twisted and partially incorrect statement of facts.[1]  The government continues to represent that the controlled purchases with Gilbert Montoya were for <u>crack</u> cocaine. *Answer Brief (AB)* 6.  However, the substance was not tested to be crack.  The only test performed revealed it was <u>not</u> crack cocaine; it was powder cocaine. II App. 341-43.  The defense did not learn about this until a post-trial email with the prosecutor about a suppressed lab report. *Id*. This factual distinction is vitally important to the foreseeability of obstructing an "official proceeding", which in this case is a <u>federal </u>grand jury.[2]

The government also cites several "facts" not found in the record.  For example, the government claims that Bryan told Commander Hudson that the investigation had been leaked. *AB* 7.  However, there is no such statement by Bryan.  The government also claims that Officer Olivas told Ahrensfield that a CI was purchasing drugs from Gilbert Montoya. *AB* 8.  However, the testimony of Olivas shows differently:

---

[1] The government also incorrectly states that Appellant violated 10th Circuit by not attaching trial transcripts to his appendix.  However, Appellant properly ordered all the transcripts as required by the rule. *See* 10th Cir. R. 10.1. Moreover, "[a] party referring to evidence whose admissibility is in controversy must cite the pages of the appendix <u>or of the transcript at which the evidence was identified</u>…" Fed. R. App. Proc. 28.

[2] The governing statutes create statutory mandatory minimum sentences, at different quantities, when comparing crack to powder cocaine. *Eg.* 21 U.S.C. §841.

> Q:  Did you also let the defendant know that a CI or confidential informant was being used?
> A:  I don't believe I specifically told him that. III Supp. App. 1039.

Moreover, Olivas did not tell Ahrensfield that Montoya was about to be arrested. *Id*. 1060.  Obviously if Ahrensfield was not told the information, he could not have relayed that to Bryan.  Ahrensfield was also not who told Bryan that  it was Montoya being investigated for dealing drugs out of Car Shop. (III Supp. App. 950-51.

As for the government's characterization that there was something wrong with Ahrensfield driving his girlfriend's car which was not registered to him, *AB* at 9, the testimony was not so suspect.  The defense objected to this portion of questioning at trial because "Ms. Neda [was] misconstruing the questions" asked of Bryan at the grand jury proceeding.  *Id*. 933-34.  Once the entire line of questioning was read from the grand jury transcript, it was clear that Bryan had "seen [Ahrensfield] drive her Jeep on many occasions, so [he] wouldn't have thought anything of it." *Id*. at 935.

Continuing on its pattern of mischaracterizing the facts, the government states, "Bryan testified he informed his employees about the investigation." *AB* 10.  That is incorrect.  The testimony cited by the government in support of that supposed fact states the opposite:

> A. I called each employee in individually.  Because, once again, at that point, we did not know who, what, where, when, or how, and asked each

2

employee had they done something wrong?  Had they gone and gotten
themselves in trouble for something that would compromise my business,
my family?  Because all of these things—I did not call them all into a
meeting.  I spoke to them individually because I needed to try to figure out
what was going on.
Q. Including Gilbert Montoya; you spoke to him as well?
A. Gilbert Montoya was an employee, yes, so he was spoken to as well.
Q. About this investigation?
A. <u>No, not about the investigation</u>.  I asked him the same questions I asked
each individual employee, outside my wife and my daughter who worked
there. III Supp Appx. 966 (emphasis added).

Therefore, Bryan did not testify that he "informed his employees about the

investigation" as the government falsely claims.

   The government also asserts that Bryan first admitted, but later denied, that

Ahrensfield told him that his finances were being investigated. *AB* 10.  However

that is a mischaracterization of what transpired.  The colloquy went as follows:

Q. Okay. And the defendant told you that your finances were being
investigated; right?
A.  I guess, technically, it would be yes, that we were being looked
into.  And the way that those questions were asked, you started
hammering on all these things, and I answered yes because I didn't
know what all of that meant.[3]
--- ---
Q. Mr. Bryan, did the defendant tell you that your finances were being
investigated?
A. He told me that there was a rumor we were being investigated; that
I was supposed to be some sergeant major, some crime lord, and I was
being looked into.  He did not go into details of what—you started
asking those questions.  I didn't—I don't know, I don't know what all

---

[3] This witness also testified that he believed the government was engaging in word play when
questioning him at the grand jury proceeding and "trying to get me—to trick me into saying
something…" III Supp. App. 989.

this stuff means.  All I know is that he came to me with a rumor, an obnoxious one, and all of this began.
Q. Did he tell you that your finances were being investigated?
A. <u>I would have to say no</u>, I don't know the answer to that.  He said I was being looked into.
Q. Did he say that the financial aspects of your company was being investigated?
A. Same answer.
Q. He didn't ask you about it at all?
A. No, he did not. III Supp Appx. 946.[4]

The government also relies on hearsay statements that are not part of the record as substantive evidence constituting the government's case-in-chief. *See AB* 10-11.  All the facts cited in the answer brief about what Commander Hudson testified that Bryan told him, is hearsay.  Defense counsel objected to that at trial. III Supp. App. 843, 843.[5]  The district court instructed the jury:

> Members of the jury, again, as I told you earlier, the out-of-court statements made by Shawn Bryan to Commander Hudson would be hearsay if they're offered to prove the truth of the statements.  If they're offered for your consideration simply to show that Commander Hudson did with the

---

[4] As cited in the BIC, Bryan has memory issues that are not feigned, but rather the result from an injury sustained while serving his country abroad.  Rule 801(d)(1)(A) does not allow impeachment testimony in such a case to be considered for substantive purposes.  A prior statement may only be admitted under Fed. R. Evid. Rule 801(d)(1)(A) where the witness's memory loss is not genuine, or is contrived. *United States v. Knox*, 124 F.3d 1360, 1364 (10th Cir. Okla. 1997); *United States v. Mornan*, 413 F.3d 372, 379 (3d Cir. 2005). *See also e.g.United States v. Balliviero*, 708 F.2d 934 (5th Cir. 1983) (faulty memory is not inconsistent with a previous statement).

[5] In opposing the Rule 29 motion below, the government relied on other hearsay statements.  For example, the first paragraph on page 2 of the government's response discusses statements from the CI to Ryan Buckner, which were all hearsay.  Likewise, the first paragraph on page 5 contains hearsay from Bryan to Lt. Smith.  The district court repeatedly instructed the jury that the statements were not offered for the truth but just to explain why the officers did what they did.

information provided by Shawn Bryan, whether it was true or not, that is not hearsay and you can consider it for the sole purpose of understanding what Commander Hudson's reaction was to it and what he did in response. III Supp Appx. 844- 845.

The government is improperly offering these statements as true facts of the matter asserted and as such, the Court should respectfully not consider this hearsay as substantive evidence.

Another attempt to mislead this Court is when the government claims that "Bryan identified the CI". *AB* 11. The government leaves this court with the impression that Ahrensfield told Bryan the identity of the CI. *Id.* That is not true. The record establishes it was <u>not Ahrensfield</u> who told Bryan that a confidential informant was involved. III Supp. App. 948. Bryan testified that he figured out who the confidential informant was after speaking to Joe Hudson, <u>not Brad Ahrensfield</u>. III Supp. App. 979; TT Page 257, lines 7-23. In fact, Olivas even testified that he did not tell Ahrensfield the identity of the CI because he did not even know that. III Supp. App. 1039-40.

Finally, the government claims the investigation ended because there were "no reasonable investigative steps to take." *AB* 7. That is not true because Montoya was still arrested and questioned. The government apparently did not see anything illegal pertaining to Bryan in what Montoya had to say, in Bryan's

5

financial information request it admits was sent to Bryan's bank, or in the surveillance it conducted at Car Shop.[6]

In sum, much of the government's factual statements are nothing more than rhetoric, presumably intended to mislead this court about the government's case-in-chief. Stripping away the hearsay, the only proof before the jury of what was said between Ahrensfield and Bryan came from Bryan. He testified that he did not believe Ahrensfield was trying to commit a crime, (III Supp. App. 990) and that much of the details about the investigation came from numerous meetings and conversations Bryan had with several other people.

## II.    THE *BRADY* VIOLATION

The government cites to various red herrings, trying to distract the court from its violations. For example, the government makes much of the fact that the defense did not call Darren White as a witness and argues that somehow saves the government from its suppression of favorable evidence. *AB* 17. The government is forgetting that *Brady* is about a prosecutor's duty to produce all favorable, material evidence to the defense to ensure a fair trial. *Brady* does not involve what witnesses a defendant calls or does not call once it is blindsided with *Brady* material in the middle of a second trial. That the defense chose not to call White is irrelevant to whether the suppressed, favorable prior statement of Bryan was

---

[6] Sgt Buckner had "begun a financial investigation of Bryan by submitting a financial request to various banks". *AB* 6.

material and should have been produced before trial. The reason the defense did

not call White was because of the characterization in the agent's 302 report of the

interview with White after Bryan's suppressed interview. That report did not have

much detail, but tended to show that White denied the allegations about the text

messages. Without the testimony of Erika Bryan and Kathy White, and certainly

without the phone records or text messages to effectively impeach White's

statements, it would have been ineffective for the defense to call Darren White as a

witness.

The government also claims that the defense's handicapped use of one

suppressed transcript on two witnesses "ensured that Ahrensfield was not denied a

fair trial." *AB 22.* The government, however cannot be sure of that. The defense

had no way of incorporating the Bryan phone call, interview or text messages into

its strategy of the case. Under the government's theory, it is okay to suppress

favorable evidence from the defense. So long as the evidence is sprung on the

defense in the middle of trial, there is no violation and the court can "ensure" that

the trial was "fair". That reasoning is nonsensical. *See Smith v. Cain*, 132 S. Ct.

627, 630 (U.S. 2012).

The government also argues that the transcripts were not material because

the defense put on some evidence showing persons other than Ahrensfield

provided details of the investigation into Bryan. *AB* 23, II App. 430-34. That

notion turns *Brady* on its head. Justice Ginsburg addressed the absurdity well in

*Smith v. Cain* oral argument, which was cited in Ahrensfield's brief and left

unrebutted by the government:

> How does that make it not material? You can argue that it should be
> given diminished weight. But an inconsistent statement by the only
> eyewitness seems to me most material and useful to the defense in
> cross-examining the eyewitness. I really don't understand how you can
> -- you can argue that the jury shouldn't put much weight on it because
> there were these other things; but to say that it's immaterial I find that
> that is -- is not plausible.

BIC citing to oral argument transcript at pg. 31, lines 12-19, *Id.* pg. 32, lines 9-10.

Nonetheless, the government relies on the district court's erroneous

reasoning that "Ahrensfield already had (from the first trial) <u>sufficient information</u>

<u>with which to cross-examine</u> Hudson on that point [the source of the details to

Bryan]". *AB 24 (emphasis added)*. However, under *Brady* and *Smith v. Cain*, a

defendant is entitled to <u>everything</u>, not just "sufficient information" for a cross

examination. The government's claim that the outcome would not be different

because the jury already considered and rejected the assertion that Ahrensfield did

not provide all the details of the investigation to Bryan fails. This was a failed

strategy by the prosecution in *Smith v. Cain*. When asked why the suppressed

evidence did not have to be produced and was not material, the prosecutor

responded:

> MS. ANDRIEU: Because if they had been presented -- if those statements had been presented to defense -- or presented to a jury, the -- the outcome would have remained the same. The jury
>
> JUSTICE GINSBURG: How do you know? How do you know? How can you possibly know? The jury is supposed to decide on the credibility of this witness.  There's a statement that he made a prior inconsistent statement.

*Id*.at 47, lines 16-22.

> JUSTICE GINSBURG: But you're taking that judgment away from the jury. There was a prior inconsistent statement. Shouldn't that be the end of it? A prior inconsistent statement, one that is favorable to the defense, has to be turned over, period.  I thought that was what Brady requires.

*Id.* at 51, lines 16-21.

Indeed, that is what *Brady* requires.  The defense should have been given the transcripts before trial so it could incorporate them into the defense strategy, and not just do what it could once the defense was blindsided in the middle of trial. The district court's determination that evidence of the text messages or any testimony about them was not material because "it is not probable that the jury would have reached a different result had it heard additional evidence about the source of some of the details of which Bryan was aware", II App 435, flies in the face of the Supreme Court's determination in *Smith v. Cain*, the case heavily relied on in Ahrensfield's brief and completely ignored by the government.[7]

---

[7] The government also argued that the messages were temporally irrelevant but that is not true. Bryan testified that the text messages about details of the investigation began "immediately" meaning "[t]he morning that it all happened." III Supp. App. 884.

As for the suppressed lab report showing the substance was <u>not crack</u> cocaine, but rather powder cocaine, the government claims that Buckner's testimony that the substance appeared to his "trained eye" to be crack cocaine was "sufficient to allow the government to argue to the jury that the substance was crack cocaine." *AB 26.*  It is unbelievable the government would make that argument to the jury when it had a report showing the substance was <u>not crack</u> <u>cocaine</u>.  It is fundamentally unfair to then suppress that lab report from the defense altogether, thus depriving the defendant the opportunity to confront Buckner's testimony with the report showing the substance was not crack. Because the report impeached Buckner's testimony, it was discoverable under *Brady. See United States v. Walters*, 269 F.3d 1209 (10th Cir. 2001)(an element of *Brady* violation is whether "the evidence was favorable to the defendant as exculpatory <u>or impeachment evidence</u>") (emphasis added).

The government also claims that Ahrensfield's citation to the prosecutor's bad faith in this case by her history of *Brady* violations (including one in which this Court reversed a conviction because of her suppression of impeachment evidence and prior statement of a CI) was not proper.  However, the district court opinion on appeal states, and the government emphasizes in its brief, the finding that "the prosecutor did not act in bad faith". I App. 416, *AB* 21.  Mr. Ahrensfield disagrees with that finding.  In addition to showing the prosecutor's bad faith

through her history of *Brady* violations, the briefing also shows her bad faith because 1) she made the unilateral decision that a lab report should not be provided to the defense because under her theory, the substance appeared to be crack cocaine anyway, even though the report would have impeached the testifying officer, 2) she denied the suppressed transcript was *Brady* and represented it contained the same information that was already presented when that was not true, 3) she represented several times to the court that the transcript was produced on Sept. 22 when every witness at the evidentiary hearing contradicted that assertion, and the transcripts were not shown to be seen in the pick-up box until December, 4) Even after she knew Ahrensfield did not have the transcript of the meeting, she still did not divulge that there was also a transcribed phone call, nor did she bring both transcripts to the trial so counsel would have access to the transcript of the recorded call in time to use in cross examination. *See also* I Appx. 66-68 (Affidavit of attorney James Biamonte discussing *Brady* violation in different case).  The fact that this prosecutor continues to misapprehend her discovery duties, yet escape repercussions by waiving the "no bad faith" flag, is something this court should, respectfully consider.

## A. <u>The Government Failed to Cite to the Most Important Case.</u>

In responding to Mr. Ahrensfield's brief, the government failed to address the case on point with respect to *Brady*.  Mr. Ahrensfield's brief discussed the very

11

recent Supreme Court case which reiterated a prosecutor's *Brady* obligations with respect to the materiality element. *Smith v. Cain*, 132 S. Ct. 627 (U.S. 2012). The 8-1 decision authored by Chief Justice Roberts reversed a conviction and ordered a new trial where the prosecution withheld a detective's notes containing statements by a witness that conflicted with the witness' testimony identifying Smith as a perpetrator. *Id*. Ahrensfield analogized *Smith v. Cain* to this case because both involve whether the suppressed evidence was material. Also, both cases involve a prior statement of the prosecution's key witness that contradicts that witness' trial testimony and exculpates the defendant. The government failed to even attempt to distinguish *Smith v. Cain* or explain why the Supreme Court's reasoning and holding in *Smith v. Cain* does not shed new light on the *Brady* doctrine and require a new trial for Mr. Ahrensfield. *See, Jordan v. Bowen,* 808 F.2d 733, 736 (10th Cir.), *cert. denied,* 484 U.S. 925, 98 L. Ed. 2d 247, 108 S. Ct. 287 (1987) (party's failure to argue an issue in its brief is deemed to have waived that contention on appeal).

The only direct, non-hearsay evidence of what Ahrensfield told Bryan on the night in question comes from the testimony of Bryan—he is the only "eyewitness". The prosecution suppressed a transcribed, recorded statement that the government had of its only eyewitness that contradicted his prior statements and exculpated Ahrensfield. The Supreme Court in *Smith v. Cain* stated that the witness's

undisclosed statements directly contradict his testimony and thus "Boatner's undisclosed statements were plainly material." *Smith v. Cain*, 132 S. Ct. 627 (U.S. 2012). The Court should reverse and order a new trial because the government is unable to distinguish *Smith v. Cain* from the case at bar, which was decided after the district court's decision, and demands a new trial for Mr. Ahrensfield.

    **B.** **In addition to failing to acknowledge *Smith v. Cain*, the government improperly cited to matters outside of the appellate record and argued issues not before this court.**

The government's first shot at raising a dead issue, rejected by the district court, is found in footnote 8 of its answer brief. *See* I Supp. App. 123-135; *Doc. 196, Order denying motion*. The government claimed to the district court that an email between the prosecutor and defense counsel that was not presented to the district court before, should cause the district court to change its findings in its opinion on the *Brady* issue. The district court denied the government's motion. I Supp. App. 123-135. The government has not cross-appealed that decision. That issue is therefore irrelevant and not part of the record on appeal. Therefore, discussing that issue in its answer brief is completely inappropriate and the court should respectfully not consider any of it.

However, in addressing the issue, the email did nothing to change the fact that the government suppressed exculpatory evidence. As the email shows, all that the defense knew back in May 2010, was non-verified information that there "may

be" text messages.  The prosecutor's response email denied there was any value at all to the interview.  Then, her complete suppression of the contents of the recording and transcript, made it impossible for the defense to discover that the prosecutor was wrong, and that there <u>was</u> exculpatory evidence in the transcript. The government has made much more of this email than is there and the district court recognized that when refusing to reconsider its findings on the issue.

What the email does is cast more light on the prosecutor's disturbing view of her *Brady* obligations.  The email highlights that the prosecutor was in possession of a CD of an FBI interview of Bryan in May of 2010, which she failed to disclose to the defense until after the second trial.  Moreover, despite knowing the true contents of the recordings, and that there was exculpatory evidence therein, the prosecutor's email downplayed the exculpatory nature of the interview, stating it was just "strange allegations" by Bryan that were not relevant.  The prosecutor's response email also claimed that "Bryan apparently fired Sam and came into FBI for an interview" when in fact the defense later learned that the FBI called Bryan, recorded that telephone call, and offered a *quid pro quo* if Bryan gave dirt on Ahrensfield.  The prosecutor's email also led defense counsel to believe that any communication regarding the investigation from Darren or Kathy White was "well after Sept. 22", however in reality, the text messages occurred "immediately" meaning "[t]he morning that it all happened." III Supp. App. 884.  Finally, the

14

defense later learned that Bryan also told agents that Joe Hudson was another source of the details of the investigation in that interview. II App. 417-18; *Doc. 170 at 13*. The prosecutor's email made no reference to Hudson as a possible source of information. Defense counsel did not know about the contents of the interview or the suppressed telephone call recording (that was over 20 pages of transcription) preceding the interview. The defense's email specifically put the prosecutor on notice that depending on the contents of the interview, he believed it "could tend to exculpate Brad". The prosecutor's email back, however, led the defense to believe there was no exculpatory evidence or relevant evidence for that matter. The government never produced either CD, either transcript, or the lab report. In sum, although the email shows that when confronted, the prosecutor admitted there was a recording of Bryan being interviewed, she still did not produce it, nor did she divulge there were two recordings. She did not produce the transcripts, the lab report, and she misled the defense about the content and relevancy of the interview.

The defense would have prepared for trial differently had it been provided with the phone call and the interview because the defense would have known there were possibly texts sent "immediately" and not well after September 22, as the prosecutor incorrectly implied in her email. In addition, the defense would have known before trial that there <u>was</u> merit to what Bryan was saying in that interview,

and not just "strange allegations".[8]  Without producing the recordings or the

transcripts, the defense was not given the opportunity to follow up on the leads

from that interview or incorporate them into a trial strategy.

The prosecutor unbelievably thinks that "[t]he email exhange set forth in

Exhibit 15 satisfied the government's obligations under *Brady* to disclose the

substance of Bryan's interview."  I Supp. App. 97-98.  That statement is factually

and legally incorrect.  The email does not make the recording of the interview

"available" to the defense.  Rather, the prosecutor states that she "will disclose",

which she never did.  It is not the defendant's burden to secure exculpatory

evidence from the government.  It remains the government's burden to disclose

exculpatory information under *Brady*, the Federal Rules of Criminal Procedure and

the Standard Discovery Order.  "If the Government were able to avoid its *Brady*

obligations by asserting that the defendant could just as easily have gleaned the

information from the witness prior to trial, then the government would never have

a duty to disclose exculpatory information that it learns prior to trial…" II App.

425-26, *citing Banks v. Reynolds*, 54 F.3d 1508, 1517 (10th Cir. 1995)("the

prosecution's obligation to turn over the evidence in the first instance stands

independent of the defendant's knowledge" and that "the fact that defense counsel

---

[8] This is especially so since, as the defense later learned, Bryan was told by the agents they would
listen to him about his house being burglarized (which they knew was very important to Bryan)
if in return Bryan gave any criminal information on Brad. Yet Bryan had no criminal information
on Brad to give, which is also an exculpatory fact.

'knew or should have known' about the [suppressed] information…is irrelevant to whether the prosecution had an obligation to disclose the information.").

This Court should not consider this issue about the email and the government's motion to reconsider because the government has not cross-appealed the denial of the motion.  It is therefore not properly before this Court, is outside the scope of this appeal and contravenes Fed. R. App. P. 28(b).  However, even considering the email, it has no effect on whether the government produced the evidence to the defense and whether the evidence was impeachment material or favorable and material to the defense.  Moreover, the email is further evidence of this prosecutor's skewed view of justice and what is required of her under *Brady*.

### III.    FALSE STATEMENTS/ DOUBLE JEOPARDY ISSUE

Mr. Ahrensfield argued that the admission of evidence in the second trial pertaining to matters he was acquitted of in his first trial, violated his double jeopardy rights.  The government responds that defendant's argument fails because the false statements charge does not have the same elements as the obstruction of justice charge. *AB* 45.  However, that is irrelevant because Ahrensfield is not claiming the entire prosecution for obstruction of justice is barred.  He is arguing that the presentation of evidence and argument to the jury about what he was acquitted of – the making of false statements – should be barred.  This is an issue of claim preclusion under the double jeopardy clause referred to as "collateral

17

estoppel." *See United States v. Wittig*, 575 F.3d 1085, 1098 (10th Cir. 2009).

"When an issue of ultimate fact has once been determined by a valid and final

judgment of acquittal, it 'cannot again be litigated' in a second trial for a separate

offense." *Yeager v. United States*, 129 S. Ct. 2360, 2367 (U.S. 2009). Thus, the

government's obstruction prosecution in the second trial should not have been

premised on the making of false statements, but on a different theory. The first

jury's not guilty verdict estopped the government from presenting a false

statements theory in the second trial.

The government briefly argues the false statements were presented under a

lower standard of proof, the standard of Rule 104. The government does not

elaborate what that standard of proof is or exactly how the false statements were

presented under a lower standard. *AB* 46. The government makes this argument

because it is not precluded from relitigating an issue <u>when it is presented in a</u>

<u>subsequent action governed by a lower standard of proof</u>. *See Dowling v. United*

*States*, 493 U.S. 342 (U.S. 1990). However, this Court should reject the contention

that there was a lower standard of proof. The government's burden of proof on

each element of obstruction of justice is "beyond a reasonable doubt". The

government admits that the false statements were presented to prove the element of

intent as to Ahrensfield's "guilty knowledge". I App. 51. Therefore, the

presentation of false statements in the second trial to prove an element of the

18

offense of obstruction "beyond a reasonable doubt",  is not subject to a lower standard of proof than in the first trial, in which the burden was also "beyond a reasonable doubt" and the jury found Mr. Ahrensfield not guilty.

Mr. Ahrensfield cited how the alternative remedy of giving a jury instruction to cure prejudice from this issue was used in *United States v. Rey*, 2010 U.S. Dist. LEXIS 24021 (D.N.M. Mar. 2, 2010) when the District Court, acknowledging there were collateral estoppel and double jeopardy concerns, allowed an instruction to the jury pertaining to the previous acquitted conduct.  The government states that *Rey* did not allow such a jury instruction, but that is not true. *See United States v. Rey*, 2010 U.S. Dist. LEXIS 24021 (D.N.M. Mar. 2, 2010), I App. At 84 ("The Court will, however, grant Rey's alternative request for a jury instruction that the marijuana found in his yurt was for personal use rather than for distribution.").  In *Rey*, a jury acquitted the defendant of possession with intent to distribute marijuana.  The government retried the defendant for the hung count of maintaining an establishment to manufacture or distribute marijuana.  The defense sought to exclude the government from arguing that Rey had the marijuana for distribution purposes.  Therefore, like here where Ahrensfield is arguing that the government cannot base its prosecution for obstruction based making false statements, Rey argued that the government could not base its prosecution on the argument that Rey distributed marijuana.  Judge Browning stated:

19

The proposed instruction should address Rey's double-jeopardy, collateral estoppel, and rule 403 concerns, as the jury will not be allowed to re-assess whether Rey intended to distribute the marijuana in his yurt. It will also, however, not impede the United States from presenting its case in full.

I App. 95-96.

Mr. Ahrensfield offered possible jury instructions in his case, such as "You are instructed that Mr. Ahrensfield was already found to have not made false statements to law enforcement", "It has been determined that Mr. Ahrensfield is not guilty of making false statements to law enforcement", or "Mr. Ahrensfield has been found not guilty of the charge of making false statements to the FBI". I App. 127. Excluding references to false statements or fashioning an instruction would have been an appropriate remedy to ensure that Mr. Ahrensfield was not forced to rebut allegations of which he was already acquitted. The district court erred by denying both requests.

## IV.    THE JUDGMENT OF ACQUITTAL

The government claims the evidence was "more than sufficient" to find Mr. Ahrensfield guilty of obstruction of justice beyond a reasonable doubt. *AB* 31. That cannot possibly be true. The district court's decisions in two different trials was not anything close to finding evidence "more than sufficient" to support a conviction. Instead, the court found it was an extremely close case on both trials. The juries also believed it was a close case, as demonstrated by the hung jury in the first trial and the nearly hung jury in the second. The second jury at one point sent

a note that they "voted twice and cannot reach a unanimous decision." II App. 169.

Even the district court agreed that in the second trial, Bryan did not receive a lot of

the details of the investigation from Ahrensfield. *Doc. 171* at 13, Appendix 453.

Therefore the facts do not show "more than sufficient" evidence.

The government's answer brief relies only on *United States v. Phillips,* 583

F.3d 1261 (10th Cir. 2009), and does not even attempt to distinguish *Aguilar,*

*Quattrone* or *Arthur Anderson*, which were all cited by Mr. Ahrensfield in his

brief, and which all support granting of his motion for judgment of acquittal.  The

government's attempt to analogize this case to *Phillips* is misplaced.  The

government claims that the facts in this case are "even stronger than those in

*Phillips*" because Mr. Ahrensfield was a police officer and *Phillips* did not involve

"detailed planning and clandestine behavior".  *AB* 40.  However, there is no

"detailed planning" in this case.  The allegations against Ahrensfield involve one

conversation in one night with Bryan, not a detailed and drawn out conspiracy.

Also, the "clandestine behavior" is not indicative of a case stronger than

*Phillips* because it does not directly prove anything.   There was similar

"clandestine behavior" in the meeting between Bryan and Commander Hudson.

Bryan met with Hudson walking down the sidewalk of his neighborhood on

Candelaria Boulevard, "wearing a hooded sweatshirt with the hood pulled up over

his head". III Supp Appendix 774.  Hudson pulled towards Bryan and picked him

up and drove off. *Id.* Once inside, Bryan removed the battery from his cell phone. *Id.* 840. The government does not assert that this behavior between Bryan and Hudson is nefarious, even though it is very similar to how Ahrensfield picked up Bryan. The direct statement by the defendant in *Phillips* that he "burned" the undercover officer is far stronger evidence of intent than the stretch of circumstantial evidence the government is trying to make in this case.

Also, here there was no obstruction of any investigation, let alone obstruction of an "official proceeding". Mr. Ahrensfield argues the very damaging point that Montoya was arrested, interrogated for hours and there was no implication of Bryan in any criminal activity. There was simply never going to be anything uncovered about Shawn Bryan because he was not dealing drugs or stolen property. Despite interrogating Montoya, despite having Bryan's financial records requested, despite the hours of surveillance at Car Shop, there was nothing on Bryan. That is why the investigation into Bryan ended. It was going nowhere from the beginning. The government mischaracterizes this argument as the "mechanic's decision not to cooperate with FBI...that ended the investigation." *AB 35.* However, the government cannot equate a "decision not to cooperate" with someone who is interrogated for hours and has no information to give. The government refuses to accept that Bryan was not involved in criminal activity, and is using Brad Ahrensfield as a scape goat for that reality.

22

It is not, as the government claims, possible that the jury could have reasonably found that "Ahrensfield wanted to warn Bryan to thwart any investigation of criminal activity by Bryan or his employees". *AB 36.* There is absolutely no evidence that Ahrensfield ever directed Bryan to do anything to thwart an investigation. The government states that Bryan's alleged testimony that he informed his employees about the investigation the next morning was something the jury could have concluded were the precautions Ahrensfield had intended. *AB* 37. That is wrong. In addition to there being no evidence of Ahrensfield instructing Bryan to do anything, Bryan <u>never</u> testified that he informed his employees about the investigation. He testified that he <u>did not</u> tell his employees about an investigation. That was one of the facts mis-cited by the government. The little information about an investigation that Ahrensfield is accused of telling Bryan fits squarely within the holding in *Aguilar* as innocent statements that do not run afoul of § 1512. Just like Judge Aguilar who leaked details of a wiretap but lacked knowledge or intent to obstruct an "official proceeding", so did Brad Ahrensfield lack knowledge or intent to obstruct an "official proceeding". Despite the discussion of how *Aguilar* is analogous to the case at bar, the government completely failed to mention *Aguilar* in its answer brief.

In *Arthur Andersen LLP v. United States*, 544 U.S. 696 (U.S. 2005), a case discussed by Ahrensfield and left unmentioned by the government, the Court rejected the government's heavy reliance upon 18 U.S.C. § 1512(e)(1), which states that an official proceeding "need not be pending or about to be instituted at the time of the offense." *Id.* at 707.  Pursuant to *Arthur Anderson*, a defendant must contemplate within his mind a particular official proceeding and that the proceeding will be obstructed by his conduct to violate the statute.  Mr. Ahrensfield did no such thing.  *See also, United States v. Quattrone*[9], 441 F.3d 153 (2d Cir. 2006).  The district court thus erred in holding that:

> Bryan's testimony at the second trial undisputedly established that Ahrensfield told Bryan that there was an investigation and that Bryan was suspected of running a criminal enterprise out of Car Shop. Based on this evidence alone, the Court would conclude that the Government presented sufficient evidence to allow the jury to find that Ahrensfield intended to obstruct an official proceeding when he told Bryan that there was a rumor that Bryan was running a criminal enterprise. *Doc. 171* at 13, Appendix 453.

It is error to find that Ahrensfield obstructed an official proceeding based solely on the fact that Ahrensfield told Bryan there was an investigation and that Bryan was suspected of running a criminal enterprise.  *Aguilar* and *Arthur Anderson* say this is not sufficient.  18 U.S.C. § 1512(c)(2) does not criminalize obstruction of an **investigation**, nor does it reach as expansively as the United States would like it to reach. *See Aguilar*, 515 U.S. at 599 ("it is not enough that

---

[9] *Quattrone* was also cited by Ahrnesfield and ignored by the government.

there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority.").

Also, the very definition of "official proceeding" requires that it be federal in nature; in this case, a "Federal grand jury". 18 U.S.C. § 1515(a)(1)(A) defines "official proceeding" in pertinent part as:

> A. a proceeding before a judge or court of the United States, a United States magistrate, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Claims Court, or a <u>Federal grand jury</u>; (emphasis added)

The government cites to former detective Gonzales' testimony that "when you arrest somebody for a felony, it always goes to grand jury." *AB* 41. That testimony is directly contradicted by Ahrensfield's testimony that, "[I]t is rare in an officer's career, probably less than 10 percent of the time do officers testify at grand jury. The majority of the cases don't go to grand jury." IV Supp. App. 1189; TT Page 466, Lines 6-9. Brad is "a police officer with 14 years of experience and specialized knowledge of the criminal justice system and the conduct of criminal investigations." *AB* 40. Besides, it does not matter what detective Gonzales believes, what matters is what was foreseeable to Ahrensfield and what his intent was in making the statement to Bryan about the existence of an investigation.

The government seems to admit that this case was only in the investigation stage. ("The grand jury also <u>could have been used</u> to present the CI's testimony and secure an indictment against Montoya as incentive for him to work as an

informant." *AB* 6 (emphasis added).)  The <u>federal</u> government did not secure an

indictment against Montoya because the drug quantities were nowhere close to

meeting the federal threshold.   The government claims that it is not relevant, but if

the drug was actually cocaine, there is a lower threshold for federal prosecution,

and the quantity of "cocaine" here would have made the offense state level.  The

quantity required for each type of drug varies under 21 U.S.C. § 841.   This is very

relevant when looking at the definition of "official proceeding", which is a <u>Federal</u>

grand jury.

In sum, statements by Brad Ahrensfield had no impact on the continuing

<u>investigation</u>.  Additionally, the nexus element of the charge of obstruction of

justice is not met because there was no evidence that the investigation would ever

foreseeably meet the federal threshold for drugs.  There are also no hard details

whatsoever of an intent to obstruct an "official proceeding" under the meaning of

the statute.

## V.    CONCLUSION

Mr. Ahrensfield has proven each element of a *Brady* violation due to the

government's suppression of favorable and impeachment evidence.  The

government's response does not even cite to or distinguish the main *Brady* case on

point, but instead focuses on an irrelevant matter not before the Court.  As for the

Double Jeopardy claim, this Court should reject the government's misplaced

arguments concerning standards of proof, and instead focus on the district court's error in not precluding the underline issue of false statements from being re-litigated in the second trial, or even minimizing the prejudice with a curative jury instruction. Finally, with respect to Rule 29 issue, Mr. Ahrensfield has shown the inaccuracies in the government's stated evidence in its case-in-chief.  When looking at the true evidence properly before the jury in this "close" case, Mr. Ahrensfield should have received a judgment of acquittal in the second trial.  The government failed to argue how this case does not warrant the same outcome as *Aguilar, Quattrone* and *Arthur Anderson*, nor does the government even mention those cases.

Wherefore Mr. Ahrensfield respectfully requests this court reverse the decisions of the district court which denied his motion to dismiss or for a new trial for *Brady/Giglio* violations, allowed evidence of acquitted conduct before the jury and denied his motion to for acquittal.

Respectfully submitted,


/s/ Jason Bowles
Jason Bowles
B.J. Crow
Monnica L. Garcia
Bowles and Crow
Post Office Box 25186
Albuquerque, New Mexico 87125
Telephone: (505) 217-2680

27

## STATEMENT OF COMPLIANCE

The undersigned counsel certifies that:

This brief was prepared in Microsoft Word 2010 using a proportionally-spaced type style or typeface with 14 point type.  The number of words contained in the body of this brief is 6,952.

/s/ Jason Bowles
Jason Bowles

## CERTIFICATE OF DIGITAL SUBMISSION

The undersigned counsel certifies that:

1.      there were no privacy redactions to be made in the foregoing brief for Brad Ahrensfield, and the Digital Form version e-mailed to the Court on this day is an exact copy of the written document that was sent to the Clerk;

2.      The Digital Form version of this brief for Brad Ahrensfield emailed to the Court on this day has been scanned for viruses with ESET NOD32 Antivirus, version 3.0.695.0, which is continually updated, and according to that program, this brief is free of viruses.

/s/ Jason Bowles
Jason Bowles

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was filed through this Court's EM/ECF and by and to counsel for the United States on this 1st day of June, 2012 to:

Ms. Tara Neda
Mr. Gregory Fouratt
Assistant United States Attorney
P.O. Box 602
Albuquerque, N.M. 87103


<u>/s/ Jason Bowles</u>
Jason Bowles